2015 IL App (1st) 122345
No. 1-12-2345

THIRD DIVISION
December 30, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 09 CR 14893-01 |
| | ) | |
| AUSTIN HARMON, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Noreen V. Love, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justice Fitzgerald Smith concurred in the judgment and opinion.
Presiding Justice Mason specially concurred, with opinion.

**OPINION**

¶ 1    In this case, we review a first-degree murder conviction and sentence where the defendant shot the victim in alleged self-defense or defense of others after the victim punched one of his friends while on a public way. We hold the following:

1. The State proved beyond a reasonable doubt that defendant was not acting in self-defense or defense of others from death or great bodily harm. Defendant's use of deadly force was also not justified to prevent the commission of a forcible felony, as simple battery on a public way, elevated to aggravated battery under section 12-4(b)(8) of the

Criminal Code of 1961 (720 ILCS 5/12-4(b)(8) (West 2008)) (now renumbered as 720 ILCS 5/12-3.05 by Pub. Act 96-1551, art. 1, § 5 eff. July 1, 2011)), does not suffice to satisfy section 2-8 to constitute a forcible felony (720 ILCS 5/2-8 (West 2008)) of the type that would justify using deadly force under section 7-1(a) for justified use of deadly force (720 ILCS 5/7-1(a) (West 2008)).

2. Defendant also failed to demonstrate the mitigating factors for reduction of his conviction to second degree murder where the defendant's testimony that he believed the victim's punch of his friend was a gunshot was incredible, and there was no other evidence that defendant had even an unreasonable belief in self-defense or defense of others or that he was acting under sudden and intense passion resulting from provocation.

3. The trial court erred in not allowing any questioning of a prosecution witness regarding potential bias stemming from any hope of a deal with the State for his pending criminal charges, but this error was harmless beyond a reasonable doubt because the testimony of the other witnesses in the case corroborated witness's testimony and the State's case was strong overall.

4. The trial court did not abuse its discretion in sustaining several objections to defense counsel's questions concerning what defendant thought would happen during the incident, where the majority of the objections were on valid grounds, only one objection specifically concerned what defendant thought would happen, and defendant otherwise testified extensively to his state of mind.

5. Defendant did not show any reversible error in sentencing where the record as a whole established that the court considered all relevant mitigating and aggravating factors and did not abuse its discretion in imposing a sentence of 65 years' imprisonment.

¶ 2      We affirm defendant's conviction and sentence.

¶ 3                        BACKGROUND

¶ 4      Defendant, Austin Harmon, was found guilty of first degree murder of London Clark in a bench trial. Defendant was sentenced to 65 years' imprisonment. The following background facts are from defendant's and the State's briefs, the majority being from the State's brief where the facts are presented "accurately and fairly without argument or comment" (Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013)) regarding the trial testimony, and without any argument disputing the presentation of facts in defendant's reply brief.

¶ 5      On July 25, 2009, at around 7 p.m., defendant was walking with three friends through the streets of Broadview, Illinois. Defendant was 18 years old and had just graduated from high school. The three friends defendant was walking with were: Dion Flowers; Marcus Calloway; and Darrell Williams.

¶ 6      At trial, Jason Morris testified that he was at his relative's house in the 2100 block of 22nd Avenue in Broadview around 7 p.m. on July 25, 2009. While there, he saw London Clark. Jason was friends with London's older brother, Eddie Clark, and also knew London from the neighborhood. London told Jason that he had just "got into it with some fugazies," which meant fake people and is a disrespectful term. Jason and London went out and walked together on 22nd Avenue while talking about the incident. A lot of people were outside. Jason and London then saw the same group of individuals London was talking about when they got closer to the corner. Jason recognized defendant, Marcus, and Dion in that group. He did not know the fourth person. Jason testified that Marcus was wearing his hat tilted to the left, which represented a gang. Jason testified that it seemed Marcus was looking for trouble because Marcus was never in that part of town. Jason told Marcus to straighten his "mother f***ing" hat because Marcus' hat was tilted to

the left. Tilting one's hat to the left signifies the For Corner Hustlers, or Vice Lord, gang. Jason is a Gangster Disciple. Dion and London were within two feet of each other at this point. Dion smirked and so London punched him in the face. Dion's legs buckled like he was going to fall, but Dion caught himself. London stepped back after he punched Dion. Jason stepped off to the side in a fighting stance in order to help London fight, which blocked his view of defendant, but he heard gunshots and took off running. Jason was about 20 feet away when he noticed that London was not next to him. Jason turned around and saw London on the ground. Defendant, Marcus, Dion, and the fourth individual were running in the opposite direction. Jason went back to London and used his cell phone to call an ambulance. Jason's cell phone was in a cell phone holder connected to the belt loop on his pants. Eddie came to the area, but could not view London in that condition, so he walked down the block and sat in his car.

¶ 7          The police and an ambulance arrived. Jason spoke to the police on the scene but only provided Marcus' name at that time. Jason did not see a gun in anyone's hand that night. Jason did not have a gun in his possession, and he did not see London with a gun either. Jason went to the police station and viewed two separate photo arrays. Jason identified defendant and Dion as two of the individuals who were at the scene.

¶ 8          On cross-examination, Jason explained that he was a member of the Gangster Disciples gang and that defendant and his group were in Gangster Disciple territory that night. Jason testified that it is considered disrespectful to have one's hat tilted to the left while walking through Gangster Disciple territory. This signal indicated to Jason that Marcus wanted to start some trouble. Jason testified that he was 6'1" tall and weighed 225 pounds in July 2009. Jason also acknowledged that he had criminal charges pending against him at the time of trial, but that

the State did not make any promises to him in exchange for his testimony with regard to those charges.

¶ 9        Dion testified that he was 18 years old and a freshman in college at the time of trial, that he grew up in the Broadview/Maywood area, and that he had known defendant since grammar school. Dion testified that defendant was a good friend of his and that he visited him during the pendency of this criminal case and did not want to testify against defendant but received a subpoena to testify in court. Dion testified that Marcus was another friend of his, and that he knew Darrell Williams, the fourth individual in the group, through Marcus. Dion testified that he used to be involved with the Four Corner Hustlers, and that defendant and Marcus were both also members of the Four Corner Hustlers. Darrell was associated with the Four Corner Hustlers as well. Dion knew Jason from the neighborhood and knew that Jason was the leader of the Gangster Disciples. Dion also knew London but not very well.

¶ 10       Dion testified that he was walking in the area of 22nd Avenue and Fillmore Street around 7 p.m. on July 25, 2009 with defendant, Marcus, and Darrell. They all wore hats tilted to the left. Dion explained that the titled hats meant they were associated with gangs. Dion saw Jason and London walking towards them on 22nd Avenue with angry expressions on their faces. Jason yelled at them to "turn those mother f***ing hats straight." London said, "You all heard what he said." Dion testified that London did not have anything in his hands, but Jason hid his hand under his shirt like he had a gun. Dion testified that he thought he saw the butt of a gun, but that Jason never pulled it out so he never saw it. Dion was afraid he was going to get shot but did not run off. Instead, Dion said, "We ain't even on that," which meant that they did not want any problems. London then punched Dion in the face. Dion stumbled, but caught himself so he did not fall. Within a second of London lunging at him, Dion heard three or four gunshots. Dion

testified that he did not look up while the shots were being fired but looked up after he heard the shots and saw defendant with his right arm extended and a gun in hand, and London was on the ground. Dion testified that Jason was backing away and did not have a gun in his hand. Everyone fled. Dion never saw London with a gun either. Dion further testified that neither Jason nor London ever threatened them with a gun. Dion also did not receive any injuries from the punch.

¶ 11 After Dion saw London on the ground and defendant holding a gun, he ran to Marcus' house. He ran by himself and did not know where anyone else went. Defendant, Marcus, and Darrell all ended up at Marcus' house too. All four of them went to the basement. Dion testified that defendant was sobbing and said, "[E]veryone wants to play tough out here and getting into it over nothing." Dion also testified that defendant may have said something to the effect the he "may have to serve 45 years to life for this" and told Dion and the others that he would know if someone snitched. Defendant still had the gun with him. It was a black revolver. Defendant asked the group what he was supposed to do with it, and then he went upstairs and came back without the gun. Dion testified that he did not know what happened to the gun. After that, he and the group all went to a party in Bellwood.

¶ 12 Dion spoke with the police one or two days later. Initially, Dion denied knowing anything about the shooting. Dion testified that he then had a change of heart and did not want to ruin his career, so he told the police what happened and provided a handwritten statement. Dion admitted that one of the reasons he told the police what really happened was because his mother was present for the interview. Dion also admitted that he told the police and testified before the grand jury that Jason was holding his belt buckle with his shirt over it and that it looked like a gun, but that he never actually saw a gun at the scene.

¶ 13        On cross-examination, Dion testified that it looked like Jason had a gun and that he was afraid when Jason and London approached him. Dion stated that he took it as a threat when Jason yelled at them to turn their hats straight.

¶ 14        On redirect examination, Dion acknowledged that neither Jason nor London ever threatened them with a weapon and that the only person he saw with a gun that night was defendant.

¶ 15        Gene Temesvari, a resident in the neighborhood, testified that he was inside his home at 2100 S. 22nd Avenue around 7 p.m. on July 25, 2009. Gene was making coffee at that time and observed, through his kitchen window, three African-American males between the ages of 18 and 25 walk south on Fillmore Street. After that, he heard 3 loud pops: a first pop; then a 1-to-1½ second pause, and then 2 quick more pops after that. Gene thought they were firecrackers and did not give it much thought at the time. Gene later looked out his living room window and saw two young men walk by who were not the same men he saw before. Gene also saw an individual on the ground. Gene called the police but learned that a call had already been made. Gene could not identify the three males by face.

¶ 16        Broadview police officer Klamer responded to the call of shots fired and a subject shot at 22nd and Fillmore at 7:01 p.m. on July 25, 2009. Klamer was the first officer on the scene and observed a black male leaning over another black male on the ground. Officer Klamer approached and the man said that "my brother was just shot." Officer Klamer learned that the man's name was Eddie Clark and the victim's name was London Clark. Officer Klamer called for an ambulance that transported London to Loyola Medical Center.

¶ 17        Yvette Clark testified that in July 2009 she lived in Westchester with her two sons, London and Eddie. London was 20 years old on July 25, 2009, and was enrolled at Clafin

University, scheduled to begin in August 2009. Yvette testified that she was home around 2 p.m. on July 25, 2009, and that London and Eddie were both also home. Yvette left for a picnic around 2:30 p.m. Yvette missed a call at 7 p.m. that night from London's cell phone. When she called back, Eddie answered. After that, she went to Loyola Medical Center, but London had already died. Yvette was taken to a room and saw London's body.

¶ 18    Dr. Adrienne Segovia conducted London's autopsy. Dr. Segovia's examination revealed three gunshot wounds to his body. The first bullet entered London's chest, went through his lung and tore a portion of his heart and lodged in his spine, from where she recovered it. The second bullet entered London's abdomen, went through the soft tissue and fractured his pubic bone. Dr. Segovia recovered the second bullet from London's right buttock. Both of these bullets had a downward trajectory consistent with the shooter being over the victim and shooting downward. London could have been on the ground or stumbling at the time he received those gunshot wounds. The trajectory of the bullets was not consistent with London standing erect in front of the shooter. The third bullet entered and exited London's left elbow. It was a through-and-through gunshot wound. Dr. Segovia testified that London's blood was negative for alcohol, cocaine, and heroine. Dr. Segovia opined that the cause of London's death was multiple gunshot wounds and that the manner of death was homicide.

¶ 19    Sergeant Carlo Viscioni and Detective Tom Ferris testified that they were both members of the West Suburban Major Crimes Task Force that was activated around 7 p.m. on July 25, 2009. They responded to the Broadview police department and were briefed on the facts of the case. Sergeant Viscioni spoke with Jason around 10:30 p.m. on July 25, 2009, to identify the suspects involved in the shooting. Sergeant Viscioni put together two separate photo arrays.

Jason identified defendant as the shooter and Dion as another individual who was present. Jason also identified Marcus from a driver's license as another person who was present.

¶ 20    Sergeant Viscioni, Detective Ferris, and other officers arrested defendant at his home around 12:30 a.m. on July 26, 2009. Defendant was transported back to the Broadview police department. Sergeant Viscioni and Detective Ferris conducted a videotaped interview with defendant around 1:15 a.m. Defendant was advised of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)); defendant indicated that he understood his rights and agreed to speak with the detectives. During the interview, defendant stated that he was in the area but had nothing to do with the shooting. Defendant said that he was with his friend Terrence and they walked to 12th Street and Fillmore together and hung out with some people there, then he walked home alone after that. Defendant said that he saw the police lights at 21st Avenue and Fillmore Street on his way home and heard that London got shot. Defendant said he arrived home around 9:20 or 9:25 p.m. because he had a 9:30 p.m. curfew from a gun case. Defendant said that Dion was not with them and provided detectives with names of alibi witnesses. The detectives then confronted defendant with information that a witness put him at the scene of the shooting with three of his friends. Defendant responded by saying that he could have lied and said that he shot the victim because one of the guys had a gun; instead, he maintained that he had nothing to do with the shooting and said that he was not there. Defendant told the detectives that they needed to talk to more people, like Terrence or Marcus or Dion, because defendant told them everything that he knew.

¶ 21    Sergeant Viscioni and Detective Ferris re-interviewed defendant around 5 a.m. on July 26, 2009. This interview was also videotaped. During this second interview, Sergeant Viscioni told defendant that the detectives spoke with defendant's alibi witnesses and they said that

defendant was directly involved in the shooting. Defendant then admitted that he shot London. Defendant said that he was walking down 22nd Avenue and Fillmore Street with Dion, Marcus, and Darrell, and that he had a .32-caliber handgun in his coat pocket. Defendant and his friends were walking in one direction, and London and Jason were walking toward them. Defendant said that Jason, the large individual in the other group, had his hand in his pocket, and that Jason pulled out a gun and fired the first shot. Defendant said that London then punched Dion, but defendant thought Dion had been shot. Defendant said that he reacted by firing his gun. Defendant stated that he did not remember how many times he fired his gun, but he knew that it was more than once. Defendant told Sergeant Viscioni that he was frantic and dumped his gun in a sewer. Other officers then went to search for the gun while Sergeant Viscioni continued his conversation with defendant. Defendant then changed his story about the location of the gun and said that he hid it behind a baseball park at a school near his home. That area was then searched, but no gun was found. When Sergeant Viscioni told defendant that they did not find the gun, defendant then told a third version that he threw it in a creek after the shooting. The police again searched for the gun, but it was never recovered.

¶ 22 During cross-examination, Sergeant Viscioni testified that defendant told him during one of the interviews that he thought he heard a gunshot before he fired his gun and that he was not looking for trouble. Defendant also said that he had been shot at the week before, so he got the gun for protection and carried it with him wherever he went.

¶ 23 On redirect, Sergeant Viscioni testified that defendant said London did not have a weapon on him. Also, during the first interview of defendant, defendant gave a number of different alibis and different versions of what occurred. Defendant did not state that the shooting was a terrible accident, or that he shot London in self-defense.

¶ 24    Detective Ferris also had another videotaped interview with defendant at around 8:45 p.m. on July 26, 2009. Defendant provided more details about the shooting during this interview. Defendant said that he saw Jason and London walking towards defendant and his group of friends with six or seven people walking behind them. The other people were not directly behind Jason and London; rather, they were further down the street. Defendant said that as Jason and London got closer, Jason told them to turn their hats straight and that they were going to get "f***ed up." Defendant stated that Jason never said that he had a gun but, as they got closer, defendant said that Jason raised his shirt a little bit and defendant saw a gun. Defendant said that he then heard a gunshot and, after that, London took a swing at Dion. Defendant said he heard the smack and saw Dion falling, but thought that Dion had been shot. Defendant said that the gunshot happened before the swing. He first heard the gunshot and then the smack when London hit Dion and did not mistake the punch for a gunshot. Defendant further stated that he knew there was going to be trouble – either a fight, a stabbing, or a shooting – when Jason and London walked up, but he did not turn away or back down.

¶ 25    Assistant State's Attorney Andy Dalkin had another videotaped interview with defendant around 12:45 p.m. on July 26, 2009. Sergeant Viscioni and Detective Ferris were both also present. Dalkin identified himself and read defendant his *Miranda* rights. Defendant then gave a statement to Dalkin, which was substantially the same as the statement he made to Detective Ferris admitting his guilt. However, defendant provided some additional information in his statement to Dalkin. Defendant said that after the shooting he went back to Marcus' house, and that Marcus, Dion and Darrell were there. Defendant stated that he told them he might get 45 years to life for the shooting. Defendant also said that he left Marcus' house to throw the gun in the creek. Defendant also stated that he in fact never saw Jason "up the gun," and that London

did not have a gun. Defendant further said that he had trouble with Jason and the Gangster Disciples in the past, but denied looking for trouble that night even though he was walking in Jason's neighborhood, which was Gangster Disciple territory, and knew there was a possibility he would run into them. Defendant denied going over there for revenge, however, even though he knew it was "gangsters" that had shot at him a couple of weeks earlier. Defendant claimed that he and his friends were in that neighborhood looking for females because the girls in his neighborhood were too young. Nevertheless, defendant decided to take his gun with him that night.

¶ 26        The parties stipulated that Elaine O'Brien, a certified court reporter employed by the Cook County State's Attorney's Office, transcribed the videotapes of defendant's interviews with the police and assistant State's Attorney Dalkin.

¶ 27        After the above testimony and stipulation, the State rested. Defendant's motion for a directed finding was denied. The defense then presented its case.

¶ 28        Marcus Calloway testified on behalf of defendant. At the time of trial, Marcus was a senior in college and was also in the Army National Guard. Marcus testified that defendant was like a little brother to him. Marcus was with defendant at the time of the shooting on July 25, 2009. Marcus was walking on the street with defendant, Dion, and Darrell when they were approached by Jason and London. Marcus had known Jason for over 10 years and knew that Jason had a reputation for violence. Marcus testified that Jason and London were speed walking toward them with angry expressions on their faces with 18 other guys behind them. Marcus said that Jason and London both had their hands under their shirts like they were holding guns and that Jason asked what they were doing there and told Marcus to straighten his hat. Marcus did not see a gun but thought that Jason and London were looking for trouble. Marcus testified that

Jason had his hands up under his shirt, like he was holding a gun, but conceded that he did not actually see a gun. Before the grand jury, Marcus testified that Jason was holding his belt or waist and he could not see under his shirt. Marcus also testified that London was also holding his hands like he had a gun. Marcus testified that he wanted to avoid the situation, so he turned and ran off towards his house. That is when he heard two or three gunshots. Marcus never saw defendant pull out a gun and did not even know that defendant had a gun that night. The last thing he saw was Jason and London approaching with 18 people behind them. Defendant, Dion, and Darrell all came to his house after the shooting and talked about what happened. Marcus denied hearing defendant say that he might serve 45 years to life in prison.

¶ 29    On cross-examination, Marcus testified that he was familiar with the Four Corner Hustlers, but that neither he, defendant, Dion, nor Darrell were members of that gang. Marcus also testified that while the four of them wore hats that night only one of them had his hat tilted to the left, but Marcus could not remember which one. Marcus testified that Jason, London, and the 18 other people walked up like a mob. However, Marcus acknowledged he gave a handwritten statement to the police on July 26, 2009 and testified before the grand jury on July 26, 2009, where he never stated that there were 18 people behind Jason and London. Marcus was also impeached with his grand jury testimony where Marcus testified he could see London's hands as he approached and did not see London holding a gun.

¶ 30    Darrell Williams testified he went to high school with defendant. Darrell testified he was with defendant, Dion, and Marcus at the time Jason and London approached them. Darrell did not notice anyone else in the vicinity at that time. Darrell testified that Jason and London had angry faces and that Jason told them in an angry tone to straighten their "mother f***ing hats." Darrell testified that Jason's hands were in his pants, forced in his belt, and Darrell thought that

Jason had a knife or gun. Darrell further testified that London did not say anything and that his hands were down at his sides. London then struck Dion in the face and Darrell then saw a group of people rushing out of the background towards them. He believed those people were with Jason and London. Darrell testified he could hear the impact when London hit Dion in the face and that it sounded like a loud smack. Darrell got scared, so he turned and ran. As Darrell turned to run, he heard three shots but he kept running. Darrell looked back and saw defendant holding a gun. Darrell did not see defendant pull out the gun and did not know that defendant had a gun. Darrell said that he, defendant, Dion, and Marcus all ran to Marcus' house and met up there, but claimed that none of them discussed the shooting.

¶ 31     On cross-examination, Darrell testified that all four of them were wearing hats that day but that none of them had their hats tilted to the left. Darrell further testified that he did not see anything in London's hands, that London never said he had a gun, and that London never threatened anyone with a gun. Darrell maintained that he started to run when London punched Dion but admitted that when he turned and looked back, he saw defendant holding a gun in his hand with his arm extended from his body. Darrell heard three shots and defendant was the only one with a gun.

¶ 32     Michael Ford testified that he lived in the same house as Marcus and that he had known defendant for two or three years. Michael testified that he, along with defendant, Dion, Darrell, and Marcus, all gathered in the basement after the shooting. Michael never heard defendant say that he was going to get 45 years to life. Michael also never saw defendant with a gun. Michael testified that he did not know London, but that he did know Jason, and that he knew Jason to be a "gangbanger" with a reputation for violence.

¶ 33       Defendant also testified. Defendant was 18 years old on July 25, 2009. He went to Marcus' house around 3 p.m. that day and he, Dion, and Marcus walked to a gas station and then decided to walk around after that but they were not looking for trouble. While they were walking, they came across and Jason and London. Defendant testified that Jason and London walked toward them at a quick pace, with angry faces, and there were 10 to 15 people a little bit behind them. Defendant testified that he had had conflicts with Jason about two or three years earlier, that Jason had a reputation for violence, and that he though Jason and London were approaching for trouble. Defendant also testified that he did not consider Jason to be an enemy and did not know London before that day. Defendant testified that, from about 30 feet away, Jason told them to "turn those mother f***ing hats straight." Jason and London kept walking toward them and Jason repeated his statement a few times. When they were closer, about 10 feet away, London said, "You all heard what he said." Defendant testified that Jason lifted his shirt a little bit and said, "You all about to get f***ed up."

¶ 34       Defendant testified that he saw a black and chrome gun handle in Jason's waistband. While defendant's brief states that defendant claimed he saw London with a gun, defendant testified he saw Jason with a gun. Defendant testified that he saw Jason's hand on the black and chrome handle of a gun in his waistband. Defendant testified that he was afraid that Jason would start something because of his body language and reputation. Defendant testified that London then made a quick lunge toward Dion and defendant heard what he thought was a gunshot. Defendant assumed that Dion had been shot based on the sound and the way that Dion fell back. Defendant then pulled out his gun and shot London. Defendant testified that he shot at London three times to prevent London from shooting him, Dion, or any of his other friends again. Defendant further testified that he "kind of had [his] eyes closed" and "kind of blacked out"

during the shooting. Defendant did not remember seeing London fall back, but recalled seeing him on the ground. Defendant testified that he did not continue shooting at London once he was on the ground. Defendant did not shoot at Jason because he was running away and did not shoot at the 10 to 15 people who were behind London and Jason because they all retreated back.

¶ 35 Defendant further testified that he went to Marcus' house after the shooting and that Marcus, Dion, and Darrell arrived at the house shortly after defendant arrived, and they went to the basement where they all discussed the shooting. Defendant testified that after seeing Dion in the basement and realizing that he had not been shot, defendant thought that he had overreacted. Defendant denied telling his friends that he would know if somebody snitched. Defendant never showed the gun to Dion. Defendant testified that he disposed of the gun in the creek.

¶ 36 Defendant was arrested at his home that night and then later was charged by indictment with aggravated discharge of a firearm and the first degree murder of London. Defendant testified that he did not initially tell the police the truth because he was angry with them for getting him out of bed. Defendant eventually told the police what happened and explained that he fired his gun because he thought it was necessary to do so.

¶ 37 On cross-examination, defendant stated that he yelled and swore at the police and provided a very detailed lie when he first spoke with them. Defendant conceded that the whole story about being with Terrence was a lie. Defendant also explained that he believed a Gangster Disciple shot at him a few weeks before and a couple of blocks away from the shooting in this case. Defendant bought a loaded gun off the street after that incident, and he knew that 22nd Avenue and Fillmore Street was Gangster Disciple territory. Defendant did not keep his gun at home but, rather, left it in the bushiness near a park. Defendant testified that he picked up his gun on his way to Marcus' house that day.

¶ 38      Defendant admitted that he and his friends were all wearing hats on the day of the shooting. Defendant testified that two of them had their hats tilted to the left, one had his hat tilted to the right, but defendant maintained that his hat was on straight. Defendant maintained that none of them were in a gang and that tilting one's hat in a certain direction did not mean anything anymore. Defendant denied being a member of the Four Corner Hustlers, but admitted that he associated with them.

¶ 39      Defendant admitted that he never saw a gun in London's hand and never saw London punch Dion. Defendant did not know at the time that London punched Dion but learned of this later when he and his friends discussed the incident at Marcus' house. Defendant further testified that he saw London lunge at Dion and then heard a pop sound like a firecracker. Dion started to fall backwards but caught himself. Defendant then pulled the gun out of his pocket and extended his arm toward London, who was about three feet away from him. There was nothing in between them. Defendant then aimed at London's midsection and fired a round. Defendant again testified that he did not remember what happened after the first shot because he kind of blacked out, and conceded that it is possible that London was on the ground when he fired the second and third shots. Defendant testified that he fired all three shots with his eyes closed and then, after the shots had been fired, he remembered coming back to himself. Defendant then saw London on the ground and Jason running off. Defendant testified that he then ran too. Defendant testified that he knew that London was either dead or hurt, but did not call 911 or do anything to help him. Instead, he ran to Marcus' house. Defendant testified that he had the gun in his pocket but never showed it to his friends. Defendant left Marcus' house, tossed the gun in the creek, and returned 10 minutes later. Defendant admitted that he wanted to get rid of the gun because he knew that he had done something wrong.

¶ 40    On redirect examination, defendant testified that he did not pull out his gun when Jason told him and his friends to straighten their hats and did not pull out his gun until he heard a pop and saw Dion fall backward. Defendant testified that he believed that London was armed when he shot him.

¶ 41    Michael Ford, Marcus' cousin, also testified. Michael testified that Jason had a reputation for violence.

¶ 42    The defense then rested.

¶ 43    In the State's rebuttal case, assistant State's Attorney Peter O'Mara testified that he had a conversation with Marcus before Marcus testified before the grand jury on July 26, 2009. O'Mara testified that while Marcus told him that there were other people down the block, Marcus never said that there were 18 to 20 people behind Jason and London. O'Mara also testified that Marcus never said that London or Jason had their hands in their shirts as if they had guns. The State then rested in rebuttal.

¶ 44    Following closing arguments, the trial court found defendant guilty of first degree murder. After a sentencing hearing, the court sentenced defendant to 65 years' imprisonment. Defendant's motion for a new trial/reconsideration, motion for reconsideration and reduction of sentence, and final supplemental posttrial motion for reconsideration, or in the alternative, a new trial, were all denied. Defendant appealed.

¶ 45                                    ANALYSIS

¶ 46                                I. Reasonable Doubt

¶ 47    Defendant first argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense.

¶ 48    The well-known standard for conviction was pronounced in *Jackson v. Virginia*, 443 U.S. 307 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in the original.) *Id.* at 319. A conviction should not be reversed unless the evidence is so improbable, unsatisfactory or inconclusive that it creates a reasonable doubt of defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 49    Determinations concerning the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence presented are responsibilities of the circuit court at a bench trial. *People v. McGrath*, 193 Ill. App. 3d 12, 28 (1989). When considering a challenge to the sufficiency of the evidence of defendant's guilt, a reviewing court will not retry defendant. *People v. Rodriguez*, 258 Ill. App. 3d 579, 582 (1994). "A conflict in the evidence does not establish a reasonable doubt, and a jury verdict based on substantial and credible evidence is not rendered reversible by the fact that other evidence was introduced which might, if believed, have resulted in a different verdict." *People v. Pursley*, 284 Ill. App. 3d 597, 609 (1996) (citing *People v. Mendoza*, 208 Ill. App. 3d 183, 204 (1991)). "Instead, only where the record leaves the reviewing court with a grave and substantial doubt of guilt should the conviction be reversed." *Id.* (citing *Mendoza*, 208 Ill. App. 3d at 204).

¶ 50    "Once [a] defendant presents the facts supporting self-defense, the burden of disproving the existence of justification beyond a reasonable doubt passes to the State." *People v. Scott*, 2015 IL App (1st) 131503, ¶ 32 (citing *People v. Rivera*, 255 Ill. App. 3d 1015, 1023 (1993)).

¶ 51    Section 7-1(a) of the Criminal Code provides the following regarding self-defense:

"(a) A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another

against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2008).

¶ 52    "The use of deadly force is limited to those situations where (a) the threatened force will cause death or great bodily harm, or (b) the force threatened is a forcible felony." *People v. Lee*, 243 Ill. App. 3d 1038, 1043 (1993).

¶ 53                              A. Death or Great Bodily Harm

¶ 54    Defendant argues that the State failed to prove beyond a reasonable doubt that defendant was not acting in self-defense or defense of others from death or great bodily harm. According to defendant, he saw Jason grasping what he believed to be a handgun as he approached. Jason was the leader of the Gangster Disciple gang and had a reputation for violence. Jason and London were quickly approaching defendant and his friends with angry expressions on their faces and threatening them. According to defendant, there was also a large group of individuals behind Jason and London. In his brief, defendant also states that he saw London grasping and displaying a handgun, but at trial during later testimony defendant admitted that he never saw a gun in London's hand. Defendant maintains that London's punch to Dion's face sounded like a gunshot, and he believed Dion had been shot because he was falling backward. Defendant also maintains that he "kind of had his eyes closed" and "blacked out."

¶ 55    "A defendant affirmatively raises the issue of self-defense by presenting some evidence regarding: (1) the threat of unlawful force against defendant; (2) an imminent danger of harm; (3) an aggressor other than defendant; (4) the belief by defendant that danger existed and to avert

danger, the kind of force used was necessary; and (5) the belief was reasonable." *Scott*, 2015 IL App (1st) 131503, ¶ 32 (citing *Rivera*, 255 Ill. App. 3d at 1023). Under the Criminal Code, the phrase "reasonably believes" means "that the person concerned, acting as a reasonable man, believes that the described facts exist." 720 ILCS 5/2-19 (West 2008). A defendant need not "exercise infallible judgment," only "reasonable judgment under the existing circumstances." *People v. Evans*, 259 Ill. App. 3d 195, 210 (1994).

¶ 56        The trial court found defendant's testimony to be "extremely incredible, absolutely unbelievable." We agree. While defendant testified he reacted quickly and fired with his eyes closed, defendant's entire theory and testimony at trial was self-defense which, if believed by the trial court, would have resulted in a justified use of deadly force. However, the trial court found defendant's testimony entirely incredible.

¶ 57        The kind of force used, even given the circumstances of a fight emerging, was unreasonable under the circumstances. Defendant maintained that London was brandishing a gun, but the evidence established that London in fact did not have a gun. Even according to defendant's own testimony, London never pulled out a gun.

¶ 58        Although defendant testified that his "boxing stance" prevented him from seeing the fact that London merely punched Dion, all the witnesses at the scene testified that defendant was in front of London within three feet of him. Defendant's testimony that the punch sounded like a gunshot, and therefore defendant's shooting was in self-defense or defense of others, is thoroughly incredible. Defendant gave a number of different alibis and different versions of what occurred to the police. At first defendant maintained that he thought the punch was a gunshot, but then in his videotaped interview with Detective Ferris at around 8:45 p.m. on July 26, 2009, defendant stated he heard a gunshot and then a smack when London hit Dion. At trial defendant

went back to maintaining simply that he thought the punch was a gunshot. All the other witnesses at the scene, including defendant's own witnesses, testified that they heard three gunshots, which were fired by defendant. Jason testified to hearing only three gunshots. Dion testified to hearing only three gunshots, by defendant. Marcus testified that he heard only two or three gunshots when he turned and ran toward his house. Darrell testified he could hear the impact when London hit Dion in the face and that it sounded only like a loud smack. A neighbor also heard only three gunshots that night: those by defendant killing London. No one other than defendant testified that London's punch of Dion sounded like a gunshot.

¶ 59    Further, there was evidence that, after the shooting, defendant told his friends that he could get "45 to life," and told them not to snitch, indicating a belief that he had just committed murder. The fact that defendant disposed of the weapon also indicates a guilty state of mind and knowledge that he did not merely act in self-defense, even under an unreasonable belief in self-defense. Evidence of flight, as well as discarding of the weapon, is competent circumstantial evidence that refutes the theory that defendant acted in self-defense. See *People v. Wilburn*, 263 Ill. App. 3d 170, 178-79 (1994) (the defendant's flight from the scene, instruction to his friend not to say anything, and his disposal of the murder weapon belied her claim that she acted in self-defense).

¶ 60    Further, the coroner's examination of London revealed that two of the bullets fired at Dion had a downward trajectory consistent with the shooter being over the victim and shooting downward, and were consistent with London either stumbling or already being on the ground at the time he received those gunshot wounds. The trajectory of the bullets was not consistent with London standing erect in front of the shooter.

¶ 61        Defendant also argues that he and his friends cannot be considered the "initial aggressors" under section 7-4 of the Criminal Code (720 ILCS 5/7-4 (West 2008)) for merely walking around the street of Broadview with hats on.  But even if the fact finder believes that the victim was the aggressor, the question still remains whether defendant's resort to the force was reasonable under the circumstances, and whether the amount of force used by defendant was commensurate with the force encountered. *People v. Easter*, 102 Ill. App. 3d 974, 980 (1981). To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying such use of deadly force. See *People v. Cullen*, 233 Ill. App. 3d 794 (1992) (where the record indicated that the victim was unarmed when he approached the defendant and that he did not threaten the defendant with force, but the defendant used deadly force in response, shooting the victim in the forehead from a distance of approximately four feet when the victim's hands were empty, the defendant failed to show that he acted in self-defense).

¶ 62        The court's finding that defendant committed first-degree murder was not so unreasonable, improbable or unsatisfactory as to cause reasonable doubt of defendant's guilt.

¶ 63                                 B. Forcible Felony

¶ 64        Defendant further argues that he was justified in using deadly force where the victim was committing a forcible felony at the time. Under section 7-1(a), a person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2008). Defendant argues that London punching Dion was the commission of a forcible felony. Defendant argues that he did not have to raise this issue as an affirmative defense, and that, instead, the defense is

raised at trial by the presentation of "some evidence thereon," citing to *People v. Rorer*, 44 Ill. App. 3d 553 (1976).

¶ 65 Section 2-8 of the Criminal Code defines "forcible felony" as including the following:

"§ 2-8. 'Forcible felony'. 'Forcible felony' means treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnaping, kidnaping, *aggravated battery resulting in great bodily harm or permanent disability or disfigurement* and any other felony which involves the use or threat of physical force or violence against any individual." (Emphasis added.) 720 ILCS 5/2-8 (West 2008).

¶ 66 Defendant argues that committing a battery on a public way suffices as "aggravated battery" under section 2-8 because section 12-4(b)(8) provides that aggravated battery is committed when the offender "[i]s, or the person battered is, on or about a public way." 720 ILCS 5/12-4(b)(8) (West 2008). Defendant argues that the State failed to disprove that defendant used deadly force to prevent the commission of a forcible felony, because London's battery of Dion was on a public way and, thus, was aggravated battery.

¶ 67 This argument is legally unsound. While the plain language of our Criminal Code "demonstrates the legislative determination that any battery committed on a public way, despite the other details of the occurrence, is sufficiently serious to be elevated to an aggravated battery" (emphasis omitted) (*People v. Leahy*, 229 Ill. App. 3d 1070, 1074 (1992)), section 2-8 clearly limits aggravated battery as a forcible felony to "aggravated battery resulting in great bodily harm or permanent disability or disfigurement," as emphasized in italics above. 720 ILCS 5/2-8 (West 2008). The same argument has been made by other defendants previously and was long

ago rejected. See *People v. Rodriguez*, 258 Ill. App. 3d 579, 585 (1994) ("Contrary to defendant's contention, 'forcible felony' is defined to include 'aggravated battery resulting in great bodily harm or permanent disability or disfigurement.' [Citation.] Simple battery upon a public way intentionally was omitted from the definition of forcible felony \*\*\*."). See also *Leahy*, 229 Ill. App. 3d at 1075 ("When the legislature designated a subset of aggravated batteries that would justify deadly force, it clearly demonstrated that it did not mean to provide a justification in the case of *any* battery upon a public way.").

¶ 68    The language modifying "aggravated battery," "resulting in great bodily harm or permanent disability or disfigurement," was added by amendment effective January 1, 1990. See Pub. Act 86-291, § 1 (eff. Jan. 1, 1990). There is no further legislative history. However, one of the principles of statutory interpretation is that we should give effect to every word and section of the statute. *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 209 (1997). " 'If possible, courts must give effect to every word, clause, and sentence and may not read a statute so as to render any part inoperative, superfluous, or insignificant.' " *Speedy Gonzalez Landscaping, Inc. v. O.C.A. Construction, Inc.*, 385 Ill. App. 3d 699, 701 (2008) (quoting *Newland v. Budget Rent-A-Car Systems, Inc.*, 319 Ill. App. 3d 453, 456 (2001)). Thus, we must interpret that there was a reason that mere "aggravated battery" in the forcible felony statute was amended to "aggravated battery resulting in great bodily harm or permanent disability or disfigurement." 720 ILCS 5/2-8 (West 2008). While the occurrence of a simple battery is indeed upgraded to an aggravated battery if it occurs on a public way under the aggravated battery provision (720 ILCS 5/12-4(b)(8) (West 2008)), when we turn next to the forcible felony provision of section 2-8, that aggravated battery must be an "aggravated battery resulting in great bodily harm or permanent disability or disfigurement." 720 ILCS 5/2-8 (West 2008).

¶ 69       In his reply brief, defendant points to the conflict among our courts, as at least three decisions support his position that simple battery on a public way constitutes a forcible felony against which the use of deadly force is justified, and argues that we should follow the holdings of these cases: *People v. Jones*, 226 Ill. App. 3d 1054 (1992); *People v. Hall*, 291 Ill. App. 3d 411 (1997); and *People v. Thomas*, 407 Ill. App. 3d 136 (2011).

¶ 70       In *Jones*, 226 Ill. App. 3d at 1056, the Third District held that an aggravated battery conviction was properly used to impose an extended-term sentence for being convicted within the past 10 years of a forcible felony. The court reasoned that it did "not think the legislature was concerned with the type of aggravated battery the defendant was charged with, but rather was concerned with the harm that resulted from the battery" because section 2-8 delineating "forcible felony" includes "*any* felony involving the use of physical force or violence against any individual." *Id.* The Third District realized it was not on solid ground in its interpretation: "We acknowledge, however, that the statute is subject to more than one interpretation. Although we believe our interpretation is what the legislature intended, we would welcome further clarification by the legislature." *Id.* The *Jones* court also did not cite to any other precedent supporting its legislative intent analysis. Moreover, the *Jones* court did not consider the issue of an aggravated battery as a forcible felony justifying the use of deadly force in the trial phase of a murder prosecution.

¶ 71       We note that the *Jones* court makes a fatal error: it ignored the disjunctive term "other" in the final residual clause of section 2-8 and conflated the "aggravated battery resulting in great bodily harm or permanent disability or disfigurement" with the residual clause for other felonies. The statute actually reads: "aggravated battery resulting in great bodily harm or permanent disability or disfigurement and any *other* felony which involves the use or threat of physical

force or violence against any individual." (Emphasis added.) 720 ILCS 5/2-8 (West 2008). Thus, the statute provides a list of types of crimes including "aggravated battery resulting in great bodily harm or permanent disability or disfigurement," and then at the end includes the residual clause "and any *other* felony which involves the use or threat of physical force or violence against any individual." (Emphasis added.) *Id.* Again, we cannot ignore words in a statute. The clear intent is to include any crime "other" than those previously mentioned that "involve[] the use or threat of physical force or violence against any individual." *Id.* We therefore do not find the *Jones* court's interpretation applicable here.

¶ 72     The court in *Hall* made the same error in reading the statute. In *Hall*, the defendant argued that his aggravated battery of the victim was not a forcible felony where it did not result in great bodily harm or permanent disability or disfigurement and therefore could not serve as the predicate offense for felony murder. *Hall*, 291 Ill. App. 3d at 417. In reading the statute, this court held that the aggravated battery *was* a forcible felony that could properly serve as the predicate offense for felony murder because defendant's aggravated battery "certainly involved the use or threat of physical force or violence" against the victim. *Id.* at 418. The *Hall* court thus conflated the delineation of "aggravated battery resulting in great bodily harm or permanent disability or disfigurement" with the final residual clause "and any *other* felony which involves the use or threat of physical force or violence against any individual." (Emphasis added.) 720 ILCS 5/2-8 (West 2008). The residual "felony which involves the use or threat of physical force or violence against any individual" cannot also be an aggravated battery; it must be some "other felony." *Id.*

¶ 73     The court in *Thomas* held that every attempted murder qualifies as a forcible felony for purposes of the armed habitual criminal statute. *Thomas*, 407 Ill. App. 3d at 140. In reaching this

holding, however, the court held that the Illinois forcible felony statute "does not require the actual infliction of physical injury; instead, the statute requires only the 'use or threat of physical force or violence,' " quoting the residual clause of section 2-8. *Id.* (quoting 720 ILCS 5/2-8 (West 2006)). This much is technically true. We run into a problem, however, in reconciling this residual clause of section 2-8 with the statute for use of force in defense of a person to justify the use of deadly force to prevent the commission of a forcible felony in section 7-1(a). If we apply the holding of *Thomas* to section 7-1(a), then a person is justified in using deadly force (720 ILCS 5/7-1(a) (West 2008)) to prevent the commission of any felony which involves even the mere "threat of physical force or violence." 720 ILCS 5/2-8 (West 2008).

¶ 74    We emphasize that the courts in *Jones*, *Hall*, and *Thomas* did not consider the interpretation of the forcible felony statute (section 2-8) in the context of the justified use of deadly force in defense of a person provision (section 7-1(a)). We therefore do not deem these cases applicable. To the extent that defendant asks us to apply their holdings to the context of the use of deadly force, we decline.

¶ 75    Defendant acknowledges that at least four cases are contrary to his position: *Leahy*, 229 Ill. App. 3d 1070; *In re Angelique E.*, 389 Ill. App. 3d 430 (2009); *People v. Schmidt*, 392 Ill. App. 3d 689 (2009), *appeal denied*, 234 Ill. 2d 545 (2009); and *In re Rodney S.*, 402 Ill. App. 3d 272 (2010). These cases do squarely address the issue of the use of deadly force to prevent the commission of a forcible felony, and they all hold that a simple battery on a public way, upgraded to an aggravated battery, does not suffice to constitute a forcible felony to justify the use of deadly force.

¶ 76    We also find *People v. Rodriguez*, 258 Ill. App. 3d 579, 585 (1994), opposes defendant's position:

"Contrary to defendant's contention, 'forcible felony' is defined to include 'aggravated battery resulting in great bodily harm or permanent disability or disfigurement.' (Ill. Rev. Stat. 1991, ch. 38, par. 2-8 (now 720 ILCS 5/2-8 (West 1992)).) Simple battery upon a public way intentionally was omitted from the definition of forcible felony: 'When the legislature designated a subset of aggravated batteries that would justify deadly force, it clearly demonstrated that it did not mean to provide a justification in the case of any battery upon a public way.' [Citation omitted.] Accordingly, defendant's contention fails." *Rodriguez*, 258 Ill. App. 3d at 585.

¶ 77 There are therefore five cases that squarely address the precise issue and prohibit using deadly force to prevent a simple battery on a public way as a forcible felony; there are *no* cases supporting defendant's position on this issue.

¶ 78 *Schmidt*'s analysis of section 2-8 is the most clear. In *Schmidt*, this court held, in relevant part, that the aggravated battery of a police officer without resulting great bodily harm or disability was not a forcible felony that could support a felony murder conviction. The *Schmidt* court noted that the forcible felony statute enumerates specific felonies, followed by the residual clause for " 'any other felony which involves the use or threat of physical force or violence against any individual,' " (*Schmidt*, 392 Ill. App. 3d at 695 (quoting 720 ILCS 5/2-8 (West 2004)), and found that, "by using the word 'other' after listing 14 specific felonies, the legislature clearly intended the residual category to refer to felonies not previously specified. Where the statute specifically enumerated aggravated battery resulting in great bodily harm or permanent disability or disfigurement, 'other felony' must refer to felonies other than aggravated battery." *Id.* The *Schmidt* court further noted that the 1990 amendment to the forcible felony statute clearly demonstrates an intention by the legislature to exclude aggravated batteries that do not result in

"great bodily harm or permanent disability or disfigurement" from the definition of forcible felony. (Internal quotation marks omitted.) *Id*. at 696. Specifically, the *Schmidt* court noted that, before 1990, the statutory definition of "forcible felony" included all aggravated batteries. However, in 1990, the legislature amended the statute by adding the phrase "resulting in great bodily harm or permanent disability or disfigurement." (Internal quotation marks omitted.) *Id*. The court found that "by enacting the 1990 amendment, the legislature expressed its intent to limit the number and types of aggravated batteries that would qualify as forcible felonies." *Id*. We agree with the analysis in *Schmidt*.

¶ 79    We further note that this court has recently again recognized that "the legislature has specified aggravated battery based on great bodily harm, permanent disability or disfigurement, to the exclusion of aggravated battery where mere 'bodily harm' has occurred." *People v. White*, 2015 IL App (1st) 131111, ¶ 39 (discussing the aggravated battery provision, now renumbered as 720 ILCS 5/12-3.05 by Pub. Act 96-1551, art. 1, § 5 (eff. July 1, 2011). In citing *In re Angelique*, 389 Ill. App. 3d at 433-34, *Rodriguez*, 258 Ill. App. 3d at 585, and *Leahy*, 229 Ill. App. 3d at 1075, this court stated: "Given the legislature's decision to add language limiting the enumerated form of aggravated battery to instances involving great bodily harm, permanent disability or disfigurement, we agree with reviewing courts that have found the legislature deliberately excluded aggravated battery based on mere bodily harm from the definition of forcible felonies." *White*, 2015 IL App (1st) 131111, ¶ 40.

¶ 80    Defendant further argues that where a penal statute is ambiguous, they must be strictly construed in favor of defendants. We do not find the statute ambiguous. While the application of the residual clause for any other felonies involving the use or threat of violence to the justified use of deadly force against forcible felonies is unclear, the delineation of aggravated batteries in

section 2-8 is clear. It is clearly modified by "resulting in great bodily harm or permanent disability or disfigurement." 720 ILCS 5/2-8 (West 2008). The felony alleged by defendant in this case is an aggravated battery (the punch by London on a public way), and not some "other felony," so the residual clause is not at issue. There is no ambiguity here.

¶ 81       We hold that simple battery on a public way, elevated to aggravated battery under section 12-4(b)(8), does not suffice to satisfy section 2-8 to constitute a forcible felony of the type that would justify using deadly force under section 7-1(a). Defendant's killing of London based on the act of London punching Dion was not justified under section 7-1(a). We affirm defendant's conviction for first degree murder.

¶ 82                              II. Reduction to Second Degree Murder.

¶ 83       Defendant argues, in the alternative, that his conviction should be reduced to second degree murder where the evidence established that defendant's belief that he was acting in self-defense or defense of others[1] was unreasonable so as to merit a reduction to second-degree murder. Defendant also argues that his conviction should be reduced to second degree murder where he acted in sudden passion resulting from provocation.

¶ 84       A person commits the offense of second degree murder when he commits the offense of first degree murder and either of the following two mitigating factors are present:

> "(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or

---

[1]   We do not include the commission of a forcible felony here as defendant does in his brief for this argument because, as discussed in the previous section, the use of deadly force in response to the commission of simple battery on a public way is not justified.

(2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable. 720 ILCS 5/9-2(a) (West 2008).

¶ 85    Defendant must prove either of these two mitigating factors by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2008).

¶ 86                    A. Unreasonable Belief in Self-Defense or Defense of Another

¶ 87    Whether defendant acted in self-defense and, if not, whether the facts of the incident constitute first or second-degree murder, are questions to be determined by the trier of fact and this determination will not be disturbed on review unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. *People v. Sanchez*, 95 Ill. App. 3d 1006, 1011 (1981).

¶ 88    As to defendant's alleged unreasonable belief in self-defense, defendant argues that Jason and London led everyone at the scene, including Dion and defendant, that they were armed and dangerous. Defendant also argues that Dion, Marcus and Darrell all testified that they were scared. While London threw the first punch, he did not use deadly force. Also, while defendant and his friends may have believed a large group behind Jason and London were affiliated with them, at no point in time did these individuals approach or join in the quickly emerging disagreement or fight. Defendant had bought his gun specifically because of his prior run-in with the Gangster Disciples, but notably defendant did not testify that he was ever threatened with death or serious bodily harm. Defendant purposefully went into a neighborhood known to be Gangster Disciple territory. While defendant was certainly free to go wherever he wished, the reason for his gun purchase and carrying his gun that night points more toward retribution and not in any belief in self-defense or defense of others, reasonable or unreasonable. While

defendant testified that he saw London place his hand on the handle of a gun in his waistband, he admitted that London never withdrew the gun and never had the gun in his hand. Moreover, defendant's testimony that London's punch to Dion sounded like a gunshot is not merely an unreasonable belief; it is thoroughly incredible.

¶ 89    Defendant's reliance on *People v. Brown*, 19 Ill. App. 3d 757 (1974) is thus misplaced. *People v. Ellis*, 107 Ill. App. 3d 603 (1982), and *People v. Collins*, 213 Ill. App. 3d 818 (1991), also are not on point because in those cases the victims were shot during a struggle and there was no intent to directly shoot the victims. See *Ellis*, 107 Ill. App. 3d at 611-12; *Collins*, 213 Ill. App. 3d at 825-27. Here, there was no mutual struggle and defendant had his arm outstretched and directly shot London three times, indicating intent to kill. The evidence simply does not support any finding of even an unreasonable belief in self-defense.

¶ 90                    B. Sudden and Intense Passion Resulting from Provocation

¶ 91    To support a conviction of second-degree murder based on sudden and intense passion resulting from provocation, there must be evidence of serious provocation of the defendant by the victim such as to arouse an intense passion in the defendant. *People v. Austin*, 133 Ill. 2d 118, 125 (1989). Serious provocation recognized as sufficient to require an instruction for second-degree murder based on provocation includes: physical injury or assault; mutual combat; illegal arrest; and adultery with the offender's spouse. *People v. Chevalier*, 131 Ill. 2d 66, 71 (1989).

¶ 92    As to sudden and intense passion resulting from provocation, defendant argues that London and Jason "caused serious provocation" and that "[t]heir sudden attack on defendant and his friends, constituted a substantial physical assault, and was the initiation of mutual quarrel and combat." In reply, defendant also argues that the State apparently concedes that defendant believed he was under "attack" and attempted to "defend himself and his friends," and that this

suffices to constitute acting under a sudden and intense passion resulting from provocation. However, as the State pointed out in its brief, while acts of passion or a sudden desire for revenge may indicate a state of mind which would support a finding of second degree murder based on provocation, if the defendant's actions were merely defensive or motivated by fear and a desire to escape the victim, a finding of second degree murder based on provocation is not appropriate. *People v. Slaughter*, 84 Ill. App. 3d 1103, 1110 (1980). Struggling with an attacker in an effort to ward off or defend one's self against an attack is not sufficient to warrant a conviction for second degree murder based on provocation. *People v. Lewis*, 229 Ill. App. 3d 874, 881 (1992). Self-defense or defense of others is not equivalent to acting under sudden and intense passion resulting from provocation.

¶ 93     If anything, it was defendant who was causing serious provocation. The evidence established that defendant had a previous disagreement with the victim and the Gangster Disciples, that the neighborhood he was in was known to be Gangster Disciple territory, that he and his friends wore their hats tilted in a way to signify affiliation with a rival gang, that they refused to straighten their hats or retreat, and that defendant purposefully brought his gun with him that evening. The fact that defendant purposefully brought his gun with him that evening points to premeditation and not a simple unreasonable belief he was acting in self-defense or defense of others or "acting under a sudden and intense passion."

¶ 94     The preponderance of evidence weighs against both mitigating factors that would reduce first degree murder to second degree murder. We therefore affirm defendant's conviction for first degree murder and find that defendant did not prove either mitigating factor under section 9-2(a) to reduce his crime to second degree murder.

¶ 95                                     III. Cross-Examination of Jason Morris

¶ 96        Next, defendant contends that his cross-examination of Jason regarding his partiality was improperly limited and resulted in reversible error. Defendant takes issue with the following sustained objection not allowing further cross-examination of Jason after the following questions:

> "[DEFENSE COUNSEL]: Excuse me. I couldn't help [but] notice you're sitting there in that DOC [Department of Corrections] outfit. It's true that you have a current charge pending against you, correct?
>
> WITNESS: Yes.
>
> [DEFENSE COUNSEL]: And it's true also that the State's Attorney's Office is the office prosecuting you for those current charges, correct?
>
> WITNESS: Yes.
>
> [DEFENSE COUNSEL]: I'm going to assume if I asked you if they made any promises you'd say no, is that true?
>
> WITNESS: Yes.
>
> [DEFENSE COUNSEL]: But you wouldn't mind if they took it easy on you a little bit with that case you got, why you're in the County for, would you?
>
> [PROSECUTOR]: Objection.
>
> [THE COURT]: Sustained."

¶ 97        "The right to cross-examine a witness stems from the defendant's sixth amendment right 'to be confronted with witnesses against him' (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; *Davis v. Alaska*, 415 U.S. 308 (1974)), and this right is applicable to State trials as well as to Federal (*Pointer v. Texas*, 380 U.S. 400 (1965))." *People v. Freeman*, 100 Ill. App. 3d 478, 481 (1981). The right of defendants to confront their accusers is obligatory on the States through the

fourteenth amendment and "includes the right to cross-examine a witness as to the witness' biases, interests, or motives to testify." *People v. Triplett*, 108 Ill. 2d 463, 474 (1985) (citing U.S. Const., amend. XIV). A "court should afford a defendant the widest latitude to establish the witness' bias or hostile motivation." *People v. Blue*, 205 Ill. 2d 1, 14 (2001).

¶ 98      A defendant has a right to cross-examine and otherwise inquire of a witness concerning pending criminal charges. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A defendant has the right to cross-examine government witnesses regarding pending criminal charges "for the purpose of showing bias, interest, or motive to testify falsely." *People v. Freeman*, 100 Ill. App. 3d 478, 481 (1981) (citing *People v. Mason*, 28 Ill. 2d 396 (1963), and *People v. Barr*, 51 Ill. 2d 50 (1972)); *Triplett*, 108 Ill. 2d at 475. The fact that a prosecution witness has charges pending against him indicates a possibility that the witness might attempt to curry favor with the government by testifying for the State. *Davis*, 415 U.S. at 316. "The defense counsel is not required to show beforehand that any promises of leniency have been made or any expectations of special favor exist in the mind of the witness." *People v. Perez*, 209 Ill. App. 3d 457, 470 (1991). "Defense counsel is entitled to inquire into such promises or expectations whether based on fact or imaginary." *Id.* at 470-71. Even subjective hopes by the witness of leniency are relevant on cross-examination. *People v. Harris*, 123 Ill. 2d 113, 148 (1988). The key factor is not the existence of actual pressure, but the witness's state of mind. *People v. Baugh*, 96 Ill. App. 3d 946, 951 (1981). Where the witness is in a position to contemplate the possibility of leniency or favor, the defendant should be allowed to question the witness concerning these matters. *Id*.

¶ 99      Defendant initially argues that the standard of review of this issue is *de novo*, "because at issue are legal conclusions to be drawn from undisputed facts," citing *People v. Foskey*, 136 Ill. 2d 66 (1990). This is not the correct standard of review. Cross-examination for this type of

impeachment is a matter of right subject only to the trial court's broad discretion to preclude repetitive or unduly harassing interrogation and to confine the cross-examination to proper subject matter. *People v. Lewis*, 229 Ill. App. 3d 874, 882 (1992) (citing *People v. Paisley*, 149 Ill. App. 3d 556, 560 (1986)). However, because the right to confront one's accusers and cross-examine a witness regarding pending charges is a constitutional right, there is a two-step standard of review. "[T]he constitutional requirement must be met before the trial court may exercise [its] discretion." *People v. Prevo*, 302 Ill. App. 3d 1038, 1047 (1999) (citing *People v. Furby*, 228 Ill. App. 3d 1, 4 (1992)).

¶ 100　　　　Thus, we must engage in a two-step analysis: first, we determine if the constitutional right was satisfied; then, we examine the trial court's exercise of discretion to restrict the scope of cross-examination. *Id.* at 1048. In conducting this two-step analysis, we look not to what defendant was prohibited from doing, but at what he was allowed to do. *Id.* at 1047-48 (citing *People v. Weatherspoon*, 265 Ill. App. 3d 386, 393 (1994)). "Only if we are satisfied that the constitutional guaranty has been satisfied will we examine the trial court's exercise of discretion to restrict the scope of cross-examination." *Id.* at 1048 (citing *Weatherspoon*, 265 Ill. App. 3d at 393).

¶ 101　　　　Here, it is clear that the trial court did not allow *any* questioning of Jason regarding potential bias stemming from any hope of a deal with the State for his pending criminal charges. It is clear that this was error.

¶ 102　　　　The State confesses this error: "Given that defendant is entitled to inquire as to a witness' subjective belief or hopes of leniency, even where no particular promises have been made, the trial court should have allowed the question."

¶ 103     However, the State argues that this error was harmless and does not warrant reversal and remand for a retrial. "[T]he standard of review of a claimed error affecting a Federal constitutional right is not whether it was harmless but, rather, harmless beyond a reasonable doubt." *People v. Freeman*, 100 Ill. App. 3d 478, 481 (1981) (citing *People v. Knippenberg*, 66 Ill. 2d 276 (1977), and *Chapman v. California*, 386 U.S. 18 (1967)). "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." (Internal quotation marks omitted.) *Chapman*, 386 U.S. at 23. If error is found, "even though it encroaches on a constitutional right, it does not require reversal where it is shown to be harmless beyond a reasonable doubt." *Prevo*, 302 Ill. App. 3d at 1047-48 (citing *People v. Ciavirelli*, 262 Ill. App. 3d 966, 978 (1994)).

¶ 104     " 'If the entire record indicates the jury was made aware of adequate factors concerning relevant areas of impeachment of the witness, no constitutional question arises merely because the defendant was precluded from pursuing another line of questioning.' " *Id.* at 1048 (quoting *Weatherspoon*, 265 Ill. App. 3d at 393).

> "The factors to be considered by a reviewing court are: ' "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." ' " *Id.* (quoting *Ciavirelli*, 262 Ill. App. 3d at 978, quoting *Van Arsdall*, 475 U.S. at 684).

¶ 105     The testimony sought would not have been cumulative, as no questioning was allowed regarding Jason's pending charges, but the testimony of the other witnesses in the case – defendant's own witnesses – corroborated Jason's testimony and the State's case was strong

overall. We agree with the State and hold that this error was harmless beyond a reasonable doubt and did not contribute to defendant's conviction.

¶ 106            IV. Limitation of Defendant's Testimony Concerning State of Mind

¶ 107            Defendant next argues that the trial court erred in denying him adequate opportunity to testify to his state of mind. Defendant again argues for *de novo* review, but it is well-settled that the admissibility of evidence at trial is a matter within the sound discretion of the trial court and the court's decision will not be overturned absent a clear abuse of that discretion. *People v. Adkins*, 239 Ill. 2d 1, 23 (2010). An abuse of discretion will only be found where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable man would take the view adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 108            A defendant who raises the issue of self-defense has the right to present evidence concerning his state of mind to show that he reasonably believed that to protect himself he needed to use the kind of force he used. *People v. Lynch*, 104 Ill. 2d 194, 200 (1984); *People v. Keefe*, 209 Ill. App. 3d 744, 751 (1991). "Perception of danger is always material and relevant to defendant's belief that the use of deadly force is justified." *People v. Whiters*, 146 Ill. 2d 437, 444 (1992) (citing *People v. Davis*, 29 Ill. 2d 127 (1963)). "It is defendant's perception of danger, not the actual peril, which is dispositive." *Id*. Self-defense and defense of others involves what the "defendant *subjectively* believed." (Emphasis in original and internal quotation marks omitted.) *Keefe*, 209 Ill. App. 3d at 751.

¶ 109            An individual is justified in using deadly force if he or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself. 720 ILCS 5/7-1 (West 2008). " 'Where a claim of self-defense rests upon some reasonable basis, exclusion of state-of-mind testimony by a defendant will ordinarily constitute reversible error

unless sufficient evidence of his intent is admitted at a subsequent stage of the trial.' " *Keefe*, 209 Ill. App. 3d at 751-52 (quoting *People v. Christen*, 82 Ill. App. 3d 192, 194 (1980)).

¶ 110　　　Defendant argues that the court erred in barring testimony concerning his state of mind in three instances during trial.[2]

¶ 111　　　First, defendant argues the trial court barred defendant from testifying as to what he believed would happen next when defendant saw London and Jason approaching him and his friends, yelling threats, and (according to defendant) holding guns. Defendant cites to 12 pages of the record of the trial proceedings during which there were two objections based on leading, one objection based on not laying a proper foundation, which were sustained but then defense counsel was allowed to continue the line of questioning with rephrasing, one asked and answered objection which was sustained, and one sustained objection to a question regarding who Jason was fighting with in an incident two to three years prior to the shooting.[3] There was only one objection as "to what [defendant] believed was going to happen next," as calling for speculation. The trial court sustained the State's objection. The objection was raised after defendant testified he saw Jason's handle on a gun. The context is as follows:

"[DEFENSE COUNSEL]: Okay. At this point what did you believe was going to happen next?

[DEFENDANT]: That we –

---

[2]　We note that while defendant did not enumerate the specific instances, defendant did generally argue that it was reversible error to "repeatedly block" defendant's testimony concerning "state of mind" in his supplemental posttrial motion for reconsideration or, in the alternative, for a new trial, sufficient to preserve review of the issue.

[3]　The court allowed testimony of Jason's membership in the Gangster Disciples, the fact that defendant knew of Jason's violent reputation "through word of mouth" and also "actually witnessed him do bad things," and that defendant was aware that Jason had been involved with a fight with other people. The court sustained the objection only as to the question, "Who was doing the fighting?"

[PROSECUTOR]: Objection to what he believed was going to happen next. That calls for speculation.

THE COURT: Sustained.

[DEFENSE COUNSEL]: It's a self-defense case, Judge. State of mind. This is why he did what he did.

[PROSECUTOR]: Well, Judge, he has to say what happened.

[DEFENSE COUNSEL]: What's on his mind.

THE COURT: I – no. I agree with the State. I mean I think he can testify to what happened, which leads to his beliefs, but not to speculate on what he thinks is going to happen.

[DEFENSE COUNSEL]: Well, I mean obviously that's what triggers his conduct, is what he believes is going to happen. The issue is whether this belief is reasonable or not, why he did what he did. That's the defense.

[PROSECUTOR]: Yes. But that's got to be based on what he sees and what happens.

THE COURT: Yes, exactly. It has to be based on what actually happens that leads him to do what he does.

[DEFENSE COUNSEL]:  He just said he saw him with a gun. I said what did you believe was going to happen next.

THE COURT: He said he believed it was a gun.

[DEFENSE COUNSEL]:  Right. But – well, so we got a belief. Now we want to know what did he think that meant. Where is his mind at?

[PROSECUTOR]: Well, Judge –

THE COURT: You can establish how it makes him feel, but you can't establish what he can speculate on as to what may happen. The objection is sustained."

¶ 112       However, defendant was allowed to substantially testify regarding his state of mind, and there is no error:

"[DEFENSE COUNSEL]: How did you feel when Jason made the comment turn your mother***ing hats straight?

DEFENDANT: Well, at that time – I was fearful.

[DEFENSE COUNSEL]: How did you feel when Jason told you that – when London said you heard what he said?

DEFENDANT: Fearful.

[DEFENSE COUNSEL]: How did you feel when Jason said you all about to get fucked up?

DEFENDANT: I was fearful. It confirmed my beliefs of what he was approaching us for.

[DEFENSE COUNSEL]: What belief did you have as they approached you?

DEFENDANT: That they were going to try to start something.

[DEFENSE COUNSEL]: And why did you feel that way?

DEFENDANT: Because his reputation and body language [*sic*].

* * *

[DEFENSE COUNSEL]: How did you interpret London Clark's statement, you all heard what he said?

DEFENDANT: Yeah, yeah. He said you all heard what he said. You all going to get f***ed up. That's exactly what he said.

[DEFENSE COUNSEL]: At that point what did you think was going to happen? You said they're about 10 feet away.

DEFENDANT: At 10 feet away before he actually got closer to us that's when I saw Jason with his hand – with his hand on a handle. I believe holding his waist really. And I believed that to be a gun.

* * *

[DEFENSE COUNSEL]: And what did you believe it to be – that handle to be attached to?

[DEFENDANT]: A gun.

[DEFENSE COUNSEL]: Okay. How did that make you feel?

[DEFENDANT]: Nervous and scared, fearful."

¶ 113     Thus, defendant indeed testified as to what he believed would happen next when defendant saw London and Jason approaching him and his friends, yelling threats, and (according to defendant) holding guns. The court sustained one objection as "to what [defendant] believed was going to happen next," as calling for speculation but defendant was allowed to testify to his state of mind. The record is replete with many instances of defendant testifying to his state of mind. We find no abuse of discretion in the court's ruling.

¶ 114     Second, the trial court at one point did not allow defendant to testify that he believed that London had a gun and had shot Dion. Defense counsel asked defendant "Well, when [London] lunged towards Dion, what did you think he was doing?" The State objected "as to what [defendant] thinks. It's got to be what he sees, Judge," and the court sustained the objection.

However, after that, with some rephrasing, defense counsel essentially elicited the very same testimony sought from defendant, that he believed London had a gun and had shot Dion:

"[DEFENSE COUNSEL]: After London lunged toward Dion, what did you do?

DEFENDANT: A pop [*sic*].

[DEFENSE COUNSEL]: What did you believe that pop to be?

[DEFENDANT]: A gunshot.

[DEFENSE COUNSEL]: Okay. What did you see Dion do after you heard the pop?

[DEFENSE COUNSEL]: Dion, he fell back like almost catching himself with one arm. Like breaking his fall with one arm (indicating).

[DEFENSE COUNSEL]: What did you believe had happened to Dion?

[DEFENDANT]: That he had been shot.

[DEFENSE COUNSEL]: Why did you feel that way?

[DEFENDANT]: I mean because Dion – first by the sound, and then Dion – he's pretty big. I really didn't see because – picture him falling off the hit. You know, thought he got shot."

¶ 115    The record shows that counsel pursued this line of questioning and defendant in fact did testify to his state of mind. Even if it could be said that initially not allowing the testimony was error, it was harmless because defense counsel proceeded to elicit the testimony sought. Where the court admits substantial evidence concerning the reasons for the defendant's fear, the exclusion of evidence which would further elucidate those reasons may be considered harmless error. *People v. Damnitz*, 269 Ill. App. 3d 51, 60 (1994) (citing *People v. Parker*, 194 Ill. App. 3d 1048, 1058-59 (1990)).

¶ 116        Third, defendant argues that he was "blocked" from presenting "[a]dditional state of mind evidence" under the "guise" of defense counsel leading defendant, citing to two specific instances in the record. The first sustained objection to leading that defendant complains of occurred as follows:

> "[DEFENSE COUNSEL]: How did you feel when you saw them approaching you?
>
> [DEFENDANT]: I was – I was nervous in a way.
>
> [DEFENSE COUNSEL]: Why did you think they were approaching you?
>
> [DEFENDANT]: I mean first we had past conflicts. You know, there was past

incidents. And that's – that's what led me to believe they was approaching us [*sic*]. But then I was

still hopeful that maybe – maybe they were going to somebody else house though [*sic*].

> [DEFENSE COUNSEL]: Did you believe they were approaching for trouble?
>
> [DEFENDANT]: Yeah, I definitely believe that. At the time I did.
>
> [PROSECUTOR]: I'm going to object to all the leading again.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: How did you feel as you saw them moving towards you?
>
> DEFENDANT: Like I said, I was nervous at first."

¶ 117        The above objection to leading occurred during trial testimony cited by defendant as the first area where the court improperly limited defendant's testimony concerning his state of mind. This was the second objection based on leading the witness. We find no impropriety in the court's ruling, as defense counsel was indeed leading defendant. As the above excerpt from the record of proceedings indicates, counsel was then permitted to continue the line of questioning without leading defendant.

¶ 118    The second sustained objection to leading that defendant contends is error occurred on redirect:

> "[DEFENSE COUNSEL]: Could you see London Clark's whole body when you fired your gun?
>
> [DEFENDANT]: When I – see, like I said, I don't remember seeing his whole body. I kind of – I just don't remember seeing his whole body.
>
> [DEFENSE COUNSEL]: Did you know London Clark was unarmed at the time you fired?
>
> [DEFENDANT]: No, I didn't. Not at the time I fired, no.
>
> [DEFENSE COUNSEL]: Did you believe he was armed?
>
> [DEFENDANT]: Yes.
>
> [PROSECUTOR]: Objection, leading.
>
> THE COURT: Sustained."

¶ 119    This objection was based on leading and occurred only after defendant had already substantially testified regarding his state of mind. The trial court sustained the State's other objections only a few times, and also only after defendant had already testified regarding his state of mind. We find that the trial court did not abuse its discretion because defendant was not in fact barred from testifying concerning his state of mind. Any additional state of mind testimony would have been cumulative. Even if there was any error in sustaining the few objections, it was harmless.

¶ 120                                    V. Sentencing Errors

¶ 121    Finally, defendant argues that the trial court committed three sentencing errors in considering improper factors during sentencing: (1) improperly considered factors inherent in the

crime itself as factors in aggravation at sentencing; (2) made improper comments regarding John Wayne Gacy and Jeffrey Dahmer in response to the mitigating factor of defendant's work history; and (3) made improper comments concerning the death penalty during sentencing.

¶ 122    Defendant argues that the standard of review is *de novo* where a person's constitutional rights turn on a legal conclusion arising from undisputed facts, citing to *People v. Clark*, 144 Ill. App. 3d 7 (1986), but the correct standard of review is abuse of discretion. A sentence within the statutory limits is reviewed on an abuse of discretion standard, so that we may alter a sentence only when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). So long as the trial court does not consider incompetent evidence or improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011). Great deference is given to the trial court's sentencing determination as the trial court is in the best position to determine the appropriate sentence. *People v. Reed*, 376 Ill. App. 3d 121, 127 (2007). This broad discretion means that we cannot substitute our judgment simply because we may weigh the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13. Absent an abuse of that discretion, the sentence of the trial court may not be altered upon review. *People v. Perruquet*, 68 Ill. 2d 149, 153 (1977); see also *People v. McAfee*, 332 Ill. App. 3d 1091, 1096-97 (2002) (reviewing the consideration of an improper factor in aggravation for abuse of discretion).

¶ 123    "Relevant factors in determining an appropriate sentence include the nature of the crime, protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects and youth." *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007). A trial court must base its sentencing determination on the particular circumstances of each case, considering such

factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id*. Because the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, nor does the presence of mitigating factors either require a minimum sentence or preclude a maximum sentence. *Alexander*, 239 Ill. 2d at 214; *People v. Flores*, 404 Ill. App. 3d 155, 158-59 (2010).

¶ 124 Although a trial court has broad discretion in imposing a sentence, it is well established that a court may not consider a factor inherent in the offense as an aggravating factor in sentencing. *People v. Phelps*, 211 Ill. 2d 1 (2004). A sentence based upon an improper aggravating factor violates a defendant's "fundamental right to liberty" and unjustly affects the right to be sentenced on proper factors. *People v. James*, 255 Ill. App. 3d 516, 531 (1993). The sentencing court may not consider "the end result of defendant's conduct, a result which is implicit in every murder." *People v. Joe*, 207 Ill. App. 3d 1079, 1086 (1991). As the legislature already considered all inherent factors when determining an appropriate sentencing range for the offense, considering the factor again when sentencing results in an improper double enhancement. *People v. Conover*, 84 Ill. 2d 400, 404-05 (1981).

¶ 125 However, " '[t]he rule that a court may not consider a factor inherent in the offense is not meant to be applied rigidly, because sound public policy dictates that a sentence be varied in accordance with the circumstances of the offense.' " *People v. Spicer*, 379 Ill. App. 3d 441, 468 (2007) (quoting *People v. Cain*, 221 Ill. App. 3d 574, 575 (1991)). "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). " 'An isolated remark made in

passing, even though improper, does not necessarily require that defendant be resentenced.' " *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007) (quoting *People v. Fort*, 229 Ill. App. 3d 336, 340 (1992)).

¶ 126     Defendant argues that the court improperly considered factors inherent in the crime itself as factors in aggravation, made improper comments regarding John Wayne Gacy and Jeffrey Dahmer in response to the mitigating factor of defendant's work history, and made improper comments concerning the death penalty during sentencing, such that defendant did not receive a fair sentencing hearing.

¶ 127                    A. Consideration of the Nature of the Crime

¶ 128     First, regarding alleged improper consideration of elements of the offense in aggravation, contrary to defendant's argument, the nature of the crime is an appropriate factor to consider. See *Starnes*, 374 Ill. App. 3d at 143. See also *People v. Tolliver*, 98 Ill. App. 3d 116, 117-18 (1981). While consideration of serious harm as an aggravating factor in sentencing a defendant for murder is improper, since serious harm is inherent in the offense, the sentencing court "may, of course, consider the force employed and the manner in which the victim's death is brought about." *People v. Joe*, 207 Ill. App. 3d 1079, 1086 (1991) (citing *People v. Saldivar*, 113 Ill. 2d 256, 271 (1986)). The prohibition is only "against the use of a single factor both as an element of a defendant's crime *and* as an aggravating factor justifying the imposition of a harsher sentence than might otherwise have been imposed." (Emphasis in original.) *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992).

¶ 129     The court then stated the following, in relevant part, during its weighing of all factors:

"I certainly have to take into consideration the facts and circumstances in this particular case and the way that London Clark's death was caused. I did prior to the State

– and I think they pointed out the appropriate paragraphs in the statute because I had already taken those into consideration and certainly taken into consideration that the acts of Mr. Harmon did, in fact, cause serious harm, that being the death of London Clark, take into consideration that the defendant does, in fact, have prior history of criminal activity. And this is something that I have been thinking about a lot."

¶ 130　　Although defendant cites to two more instances in the record where the court allegedly improperly focused on the end result of the crime that is inherent in the crime itself, we find only one more instance, and it was in the context of discussing defendant's lack of remorse:

"[Defendant] took the stand in his own case, and even in his testimony I did not denote any remorse. It was always an excuse for why he behaved the way he behaved. Not even on the stand did he ever say, you know what, maybe I acted too quickly. I'm really sorry for what I did. Not one time. Even today he didn't say he was sorry. He says God bless the victim's family. God bless my family. Never, ever said, I am so sorry for what I did. Not one time has he said that.

I think it's quite unfortunate. I think it's unfortunate because even here today I'm not seeing anything coming from [defendant] that shows that he in some way is sorry for what he did. I don't know how you can sleep at night if you took somebody's life. *** It's about I took somebody's life. I ended another human being's life."

¶ 131　　The court discussed many other mitigating and aggravating factors at length. These were the only two instances where the court made any mention of the fact that the crime was murder. It is clear from the record that the court did not consider the nature of the crime in aggravation, but only appropriately in the context of the nature of the crime and defendant's lack of any remorse and did not unduly focus on that factor as defendant argues.

¶ 132                    B. Comments Concerning Serial Killers

¶ 133     Second, defendant argues that the court erred in comparing defendant to the serial killers

John Wayne Gacy and Jeffrey Dahmer and committed error by relying on his own personal

knowledge regarding those serial killers, outside of evidence at the sentencing hearing. However,

the court did not in fact compare defendant to these serial killers. Defense counsel argued at the

sentencing hearing:

>    "If you have read his presentence investigation you will note he had been
>
>    maintaining some form of employment for many years, since he was approximately age
>
>    13. That's more industrious and more reflective of initiative than a lot of other people
>
>    take.
>
>                                    * * *
>
>    He had the ability to be a functioning, contributing member to society. And he was on
>
>    that path."

¶ 134     In response, the trial court stated the following:

>    "You know, [defendant] worked. Wake-up call. John Wayne Gacy worked. Scott
>
>    Peterson worked. Dahmer worked. The fact that you worked does not make you a good
>
>    person. These are some of – Dahmer and Gacy – some of the worst serial killers in the
>
>    nation in history [*sic*], they worked. How does that make you a better person because you
>
>    had a job?"

¶ 135     The court did not specifically compare defendant to these serial killers but, rather, made a

point that a work history was not much of a mitigating factor and did not mean defendant was a

better member of society. An employment history is a factor in mitigation at sentencing. *People*

*v. Taylor*, 6 Ill. App. 3d 343, 354 (1972). Defendant's case in support, *People v. Dameron*, 196

Ill. 2d 156 (2001), is distinguishable because there the court spoke at length about social science statistics and the court's own generalizations about crime that he discovered in a treatise through its own investigation. *Id.* at 171-72. Unlike *Dameron*, here the court did not rely on any information or its own investigation outside the record. Rather, the court merely commented that even the worst serial killers had a work history and so the court did not feel that defendant's work history was a strong mitigating factor. Placed in context, the court's comments were not prejudicial.

¶ 136                    C. Comments Regarding the Death Penalty Moratorium

¶ 137        Finally, it is apparent from the record that the trial court's comments regarding the death penalty were in direct response to defense counsel's argument regarding the death penalty moratorium. Defense counsel argued for leniency to not punish defendant to the maximum and not take a life for a life, using the example that the death penalty was abolished. The trial court's comments regarding the death penalty moratorium were in direct response to defense counsel's argument:

"I've heard a lot about Mr. Harmon being a member of the church, part of the church. And that video that I looked at doesn't reflect who he really is. Well, his actions when he first got arrested with a gun reflected who he was. He's a guy out there selling drugs with weapons on him. The video that I saw of his statement with the police department I think does, in fact, reflect who he is. *** [H]is language was horrible, MF this, F this, so forth, so on. That's the way he communicates with authority. That tells me that's the kind of guy that he is.

The defense argues that we don't live in a society where, well, just because he took somebody's life we should take his life. And I beg to differ. That's exactly – up until

recently this State was a death penalty state. That's exactly what we did. You took somebody's life. We took your life. And that's not retribution. That's punishment. We don't have the death penalty anymore, but not because of your logic. Far from that logic. We don't have the death penalty anymore in this state because if there are situations where it is absolutely uncertain that we could be *** killing the right person, you don't want to kill the wrong person for somebody else's acts.

The moratorium was on for a long period of time before finally the state repealed the death penalty. And it's just a way of ensuring that we don't, in fact, kill someone who maybe somehow in the system was found guilty and, in fact, shouldn't have been found guilty.

45 years is the minimum that I can give [defendant], because that's what the statute says. The most that I can give him is life. One thing for sure is that he will be locked away for a very, very long time. I don't believe that even at 45 years minimum that he is going to be in much of a position to go back and work on the west side as a mentor because this is a 100 percent service. Murder you do 100 percent of the time. There's no doubt about it."

¶ 138    The trial court's comments were immediately preceded by the court's consideration of mitigating evidence of the defendant's church involvement and potential for rehabilitation, contrasted with defendant's behavior captured on one of the videotaped interviews with the police and total lack of expressed remorse. The court then specifically stated it was addressing defense counsel's argument concerning the death penalty moratorium in argument for leniency in sentencing defendant, to clarify that the moratorium was not instituted as a progression away from punishment. The very next thing the court discussed is the appropriate punishment for

defendant. The court then carefully weighed the minimum sentence and defendant's potential for rehabilitation and specifically stated that it did not feel defendant would be rehabilitated with a lenient sentence. The court did not, however, sentence defendant to the maximum, life in prison. Taking the record as a whole, we conclude that the court did not abuse its discretion in imposing a sentence of 65 years' imprisonment, a mid-range sentence given defendant's age. We thus affirm defendant's sentence as well.

¶ 139                                    CONCLUSION

¶ 140        We hold that defendant failed to demonstrate that the State failed to prove beyond a reasonable doubt that defendant was not acting in self-defense or defense of others from death or great bodily harm. We further hold that simple battery on a public way, elevated to aggravated battery under section 12-4(b)(8) (720 ILCS 5/12-4(b)(8) (West 2008)), does not suffice to satisfy section 2-8 to constitute a forcible felony of the type that would justify using deadly force under section 7-1(a) for justified use of deadly force (720 ILCS 5/7-1(a) (West 2008)). Section 2-8 clearly limits aggravated battery as a forcible felony to "aggravated battery resulting in great bodily harm or permanent disability or disfigurement" (720 ILCS 5/2-8 (West 2008)).

¶ 141        Defendant has also failed to demonstrate the mitigating factors for reduction of his conviction to second degree murder. Defendant's testimony was incredible, and there was no other evidence, that defendant had even an unreasonable belief in self-defense or defense of others. Defendant's claim acting under sudden and intense passion resulting from provocation also finds no support in the evidence.

¶ 142        Although the State confesses error where the trial court did not allow any questioning of Jason regarding potential bias stemming from any hope of a deal with the State for his pending criminal charges, the testimony of the other witnesses in the case corroborated Jason's testimony

and the State's case was strong overall, and thus this error was harmless beyond a reasonable doubt and did not contribute to defendant's conviction.

¶ 143　　Defendant also has not shown any reversible error in sustaining several objections to defense counsel's questions concerning what defendant thought would happen, as the majority of the objections were on valid grounds, only one objection specifically concerned what defendant thought would happen, and defendant indeed did testify comprehensively to his state of mind.

¶ 144　　Defendant further has not shown any reversible error in sentencing. Taking the record as a whole, we conclude that the court considered all relevant mitigating and aggravating factors and did not abuse its discretion in imposing a sentence of 65 years' imprisonment.

¶ 145　　The State asks us to grant it costs incorporated as part of our judgment and order a fee of $100 for defendant this appeal, pursuant to *People v. Nicholls*, 71 Ill. 2d 166 (1978) (holding that State's attorney fee for defending unsuccessful appeal by convicted criminal defendant could be assessed as costs), section 110-7(h) of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/110-7(h) (West 2012)), section 13 of the Criminal Jurisprudence Act (725 ILCS 130/13 (West 2012)), and section 4-2002.1 of the Counties Code (55 ILCS 5/4-2002.1 (West 2012) (providing for an award of costs to the State in defending an appeal)). As oral argument was not heard in this case, we do not address the State's additional request for costs for oral argument.

¶ 146　　Section 110-7(h) of the Illinois Code of Criminal Procedure of 1963 pertains to bail deposit pending appeal. See 725 ILCS 5/110-7(h) (West 2012). Section 13 of the Criminal Jurisprudence Act was repealed by Public Act 89-234. Pub. Act 89-234, art. 10, § 10-5 (eff. Jan. 1, 1996).

¶ 147　　Since we are upholding defendant's conviction, under the authority of section 4-2002.1(a) of the Counties Code (55 ILCS 5/4-2002.1(a) (West 2012)) and *Nicholls*, 71 Ill. 2d at 174, we

assess defendant $100 in costs for the State's defense of this appeal and hereby incorporate it as part of this judgment.

¶ 148        Affirmed; costs assessed.

¶ 149        PRESIDING JUSTICE MASON, specially concurring.

¶ 150        I concur in the result.