2024 IL App (1st) 220041-U

No. 1-22-0041

Order filed February 13, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 6747 02 |
| | ) | |
| ANTONIO HENDERSON, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirmed. Statement made by co-defendant was properly admitted. Evidence was sufficient to find defendant guilty of first-degree murder and attempted murder on accountability theory.

¶ 2    The trial court found defendant Antonio Henderson accountable for the murder of Warren Strenger, and the attempted murders of Travis Willis and Dexter Pope (and lesser, now merged, offenses of aggravated battery and aggravated discharge). The shooter, codefendant Anthony Bell, was tried separately and is not a party to this appeal. The evidence at the bench trial was

largely undisputed; the key question was whether defendant, who drove Bell to and from the scene of the shooting, was thus accountable for Bell's conduct. Defendant argues on appeal that the evidence was insufficient to establish his accountability, and that the trial court based its accountability finding on an inadmissible hearsay statement by Bell.

¶ 3 The shooting took place in a Home Depot parking lot on April 17, 2018. The principal occurrence witnesses for the State were Pope (the uninjured attempted-murder victim) and two women, Jocelyn Johnson and Troyci Shelton, who were with defendant and Bell. Willis (the injured attempted-murder victim) was killed in an unrelated incident before the trial.

¶ 4 The three victims, Pope, Strenger, and Willis, all worked at a Walmart not far from the scene of the shooting. Pope testified that they took a break together and walked to a nearby liquor store. Along the way, they passed through a Home Depot parking lot. A dark van was parked beside the store. Pope noticed a man standing near it.

¶ 5 The parties stipulated that the man was Bell, whom Pope later identified as the shooter in a line-up. Bell approached the victims, with his hands in his pockets or under his belt. It was not evident to Pope at first, but as it turned out, Bell was concealing a gun. Bell asked Strenger his name or where he was from. Strenger turned toward Bell as he spoke. In short order, Bell took out a gun from somewhere on "his side" and fired several shots. Strenger and the others ran. When the shooting stopped, Strenger said to Pope, "I'm hit, bro," just before collapsing. Willis had also been shot. Pope lost sight of Bell, but he saw the van driving away, with the police already in hot pursuit.

¶ 6 Pope called 911. The paramedics took Strenger and Willis to the hospital. Strenger died of two gunshot wounds to the back. Willis was shot once in the right forearm.

¶ 7     Johnson and Shelton helped fill in some of the details and background context. Johnson, who used to date defendant, and Shelton, her cousin, were both staying with defendant. Bell was defendant's friend and often spent time with them. On the evening of the shooting, they all went to an Auto Zone, next to the Home Depot, to fix the radio in a van that defendant and Johnson owned together. Defendant drove; Johnson sat in the front passenger's seat, and Shelton and Bell sat behind defendant and Johnson, respectively.

¶ 8     Defendant parked in the lot outside the Auto Zone. While they were waiting for someone to come to fix the radio, Shelton saw three men walk behind the van, heading toward the Home Depot. She also noticed defendant and Bell "looking at them" and then making eye contact with each other. Defendant told Johnson to go to the back of the van, meaning the third row of seats, which she did. (Johnson, for her part, said she went there to get some chips.)

¶ 9     According to Johnson, Bell said "something like" this to defendant: "there they go" or "that ain't never them." Over a hearsay objection by the defense, the trial court admitted Bell's statement as that of a co-conspirator, made during and in furtherance of the conspiracy, and thus as a hearsay exclusion pursuant to Rule 801. See Ill. R. Evid. 801(d)(2)(E) (eff. Jan. 1, 2011). More on this ruling later.

¶ 10    Upon hearing Bell's statement, defendant put the van in reverse and drove toward the Home Depot. Shelton heard defendant and Bell having "a small conversation," but she was on the phone and did not hear what they said. Defendant parked at the Home Depot, near the three men, with the passenger's side of the van—where Bell was sitting—closest to them. Bell got out of the van and left the door open. After a "very short" conversation with the men, Bell opened fire. Johnson saw gunfire coming from Bell but could not see the gun; Shelton saw the gun and

said it was black. The men ran across the street. Bell got back into the van and said that the police were around (which ended up being true).

¶ 11    Defendant quickly drove off, dodging traffic, and headed toward the expressway. Shelton and Johnson asked to get out of the van, but defendant wouldn't stop. Johnson also asked why defendant and Bell were putting her and Shelton in this "predicament." She received no answer.

¶ 12    Defendant led the police on a high-speed chase. Johnson, Shelton, various Chicago police officers, and surveillance footage all provided some of the details of the pursuit. In short, Officer Pankey saw the shooting and immediately gave chase as the van left the Home Depot parking lot and headed onto the Dan Ryan Expressway. Defendant drove erratically, in and out of lanes, hit a semitruck, and eventually crashed into the median.

¶ 13    Defendant, whom Officer Pankey identified as the driver, fled on foot, hopped the security gate at the CTA Red Line station at 95th Street, and emerged on the north side of the expressway. Officers Diaz and DeWitt saw defendant trying to hide under a pedestrian bridge over the expressway. Defendant was non-compliant as the officers detained him. The arrest was captured on Officer Diaz's body cam.

¶ 14    The police caught up to Bell, who had also fled on foot, on an expressway exit ramp. Johnson and Shelton were arrested in the van and taken to the station for questioning. They both acknowledged, on cross-examination, that they were less than candid with the police at first, since they were both "scared." Eventually, however, they cooperated and told the truth. Johnson identified defendant and Bell. Shelton identified a photo of defendant.

¶ 15    A search of the van revealed a loaded, black, Glock semiautomatic handgun under the driver's seat. Three fired cartridge cases were recovered from the scene of the shooting, all of

which were fired from the gun found in the van. The gun had no prints suitable for comparison, and a mixture of DNA from at least four different people was not suitable for comparison to known DNA standards. Testing revealed no evidence of gunshot residue on defendant's hands.

¶ 16    The trial court found that defendant was accountable for Bell's offenses against the three victims. After denying a post-trial motion, in which defendant preserved his hearsay objection to Bell's statement, the court imposed an aggregate prison sentence of 56 years.

¶ 17    Defendant argues that the trial court erred in admitting Bell's statement, "that ain't never them," or "there they go," as Johnson testified. The defense, the State, and the trial court have all taken for granted, as an assumed premise and starting point of the analysis, that Bell's statement was an assertion of fact offered to prove the truth of the matter that Bell asserted. Or in other words, that Bell's statement, on its face, was hearsay. Ill. R. Evid. 801(a),(c) (eff. Jan. 1, 2011).

¶ 18    As a result, the parties and the trial court have all assumed that the admissibility of Bell's statement rises or falls on whether it fell under the co-conspirator statement rule in Illinois Rule of Evidence 801(d)(2)(E) (eff. Jan. 1, 2011). This rule provides that a "statement," defined as an "assertion" of fact, "is not hearsay" if it "is offered against a party" and was made "by a coconspirator of a party during the course and in furtherance of the conspiracy." *Id.*

¶ 19    The co-conspirator statement rule is not uncommonly referred to as a hearsay exception, but properly speaking, it is a hearsay *exclusion*: it excludes certain types of statements from Rule 801's *definition* of hearsay, even though the statements, on their face, would appear to be nothing but hearsay. The statements of a party-opponent, for example, are excluded in this way from the definition of hearsay. *Id.* § 801(d)(2). Consider a party's own admission of a relevant fact: it can be used to prove the fact admitted, even though that use obviously fits Rule 801's general

definition of hearsay, and thus it *would be* hearsay, if the rule did not expressly exclude it from the definition. *Id*. § 801(d)(2)(A).

¶ 20    Rule 801's category of "statement by party-opponent" includes various types of vicarious statements, so to speak, made by the party's agent, someone in privity, or, as relevant here, a co-conspirator in a criminal endeavor. *Id*. § 801(d)(2)(C)-(F). But before a co-conspirator's assertion of fact can be used against a defendant, as if it were the defendant's own statement, the State must show that there was a conspiracy. Under Illinois's version of this requirement, the State must make a *prima facie* showing of a conspiracy through "independent" evidence—that is, without relying on the statement in question. *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 38.

¶ 21    It bears emphasis that the co-conspirator statement rule applies to statements that would otherwise be hearsay, if not for this exclusion. See *id.* ¶ 50 (trial court did not err in "admitting the challenged hearsay statements under the co-conspirator exception"). Indeed, it would make no sense to specifically define certain types of statements *out of* the hearsay rule if they did not fall *within* the general definition in the first instance.

¶ 22    Thus, if a statement is offered for a purpose other than its truth—or if it is not a statement at all, but rather a verbal act or some utterance that does not qualify as a factual assertion—it is unnecessary to determine the admissibility of the statement by applying the co-conspirator statement rule.

¶ 23    The trial court, though in fairness following the parties' lead, made that error here. The court found that the State made a *prima facie* showing of a conspiracy through independent evidence and thus admitted Bell's statement as that of a co-conspirator during the course and in furtherance of that conspiracy (to shoot the victims). The correct ruling is that the statement was

admissible because it was not offered for its truth; it was not hearsay in the first place.

¶ 24    We may affirm an evidentiary ruling on any basis that is supported by the record. *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 61. Whether a statement is hearsay is a legal question that we review *de novo*. *People v. Padilla*, 2021 IL App (1st) 171632, ¶ 120.

¶ 25    The State was not out to prove the truth of any fact that Bell may have announced. Bell reportedly said either, "that ain't never them," or "there they go." The point of offering this statement was not to prove who "they" were, or where "they" were going, or anything else along those lines. There was no issue at trial as to the victims' identities or where they were going. Rather, the point was simply to narrate the events leading up to the shooting and to explain why defendant acted as he did. In particular, defendant went to the Auto Zone to get his van radio fixed, yet he decided to up and leave after a few minutes, without achieving that goal. Why? Because Bell spotted the victims walking by. In response, defendant drove directly to them, waited for Bell to shoot them, and then sped away from the scene with Bell and the others in tow. Statements that narrate events and give context to a defendant's actions are not hearsay.

¶ 26    Bell's statement undoubtedly bears on defendant's intent to facilitate the shootings and thus on his accountability for Bell's crimes. But that does not make it hearsay, or a statement of a co-conspirator within the meaning of Rule 801(d)(2)(E). Bell's statement was admissible, but not for the reasons given or argued; it was admissible because it was not offered for its truth.

¶ 27    Defendant also argues that the evidence was insufficient to establish his accountability for Bell's crimes. To this end, defendant concedes that he aided Bell's flight from the police after the shooting. But, he says, there was insufficient evidence that he intended to facilitate the offenses "either before or during [their] commission." 720 ILCS 5/5-2(c) (West 2016).

¶ 28     A person is legally accountable for another's conduct if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." *Id.* The State may prove a defendant's intent by showing that he shared the criminal intent of the principal or that there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 21. If there was a common criminal design, all parties bear equal responsibility for the consequences of any acts in furtherance of it. *Id*. ¶ 13.

¶ 29     The State need not prove a verbal agreement; a common criminal design can be inferred from the circumstances. *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 67; *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 34. But a defendant's "mere presence" at the scene is insufficient to establish accountability, even if coupled with his flight from the scene or knowledge that a crime has been committed. *People v. Johnson*, 2021 IL App (1st) 171885, ¶ 88.

¶ 30     In reviewing a conviction based on a theory of accountability, we apply the deferential *Jackson* standard, which, we trust, needs no further introduction. *People v. James*, 2017 IL App (1st) 143391, ¶ 41; see *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Viewing the evidence in the light most favorable to the State, a rational trier of fact could find defendant accountable for Bell's crimes. And the question is not a particularly close one, so we can be brief.

¶ 31     Defendant drove to the Auto Zone to get his van radio fixed. He waited for about five minutes, when the victims walked by, toward the Home Depot. Defendant and Bell looked at each other, and Bell said something that ultimately had the meaning, "that's them," though his exact words were somewhat different. It is more than reasonable to infer that defendant and Bell not only knew the victims but were looking for them. Defendant told Johnson to get in the back

of the van. As the trial court noted in its findings, it was also reasonable to infer that defendant was showing some concern for Johnson's safety because he knew what was about to happen and understood the danger it presented.

¶ 32    Defendant then left the Auto Zone, without getting his radio fixed, and pulled up to the victims near the Home Depot. He parked with the passenger's side of the van closest to them, so that Bell, the shooter, had the easiest access—and the quickest getaway—possible. The fact that defendant moved the van and parked in this fashion, with no instruction from Bell, reasonably suggests that there was a prior plan, and that defendant understood what Bell would do and how he would help Bell do it.

¶ 33    Defendant stayed put, with the van door open on Bell's side, while Bell approached the three victims and opened fire before promptly returning to the van. The events unfolded "quickly and seamlessly," in the trial court's description, which again supported a finding that defendant and Bell "knew what they planned to do."

¶ 34    Defendant collected Bell, took off, and refused to lose a step to the police by stopping to let the women out of the van, as they requested. He led the police on a high-speed chase down the expressway and then, after he crashed, on a foot chase, through a CTA station and back out onto the expressway, until the police caught up with him under a pedestrian bridge and forcibly arrested him in the face of his non-compliance. Though the getaway probably didn't go quite as planned, defendant was nonetheless the "getaway driver" in what the trial court described as a "classic case of accountability."

¶ 35    Indeed, "[t]he law holds the getaway driver accountable for the crime," provided that his intent to facilitate the offense did not arise purely after the fact. *People v. Jones*, 2015 IL App

(1st) 142597, ¶ 22; see 720 ILCS 5/5-2 (West 2016). Here, there was ample evidence that defendant knew what Bell was up to and intended to help him. And while not dispositive, his continued flight from the police, throughout the dramatic chase, was also circumstantial evidence that the factfinder could consider. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶¶ 96-100.

¶ 36   Defendant relies on two cases (both involving defendants named Anthony Johnson) that stand for the general proposition that an unwitting getaway driver is not accountable for the crime. In *Johnson*, 2021 IL App (1st) 171885, ¶ 103, the defendant was a freelance taxi driver, who drove his passenger to and from a shooting without knowing that he was armed or what he planned to do. In *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶¶ 141, 151, the defendant testified that he didn't know the shooter's plans or that he was armed. He followed the victim because his passenger, the shooter, said that he wanted to "holler at that guy," and he drove the shooter away from the scene, after the shooting, simply because he was afraid of him.

¶ 37   Our facts are nothing like either *Anthony Johnson* case. Though largely circumstantial, the evidence here supports a reasonable inference that defendant was in on the plan to shoot the victims, and that he did his part—both before and after the fact—to facilitate the shootings. Thus, a reasonable trier of fact could find that defendant was accountable for the murder of Strenger and the attempted murders of Willis and Pope.

¶ 38   For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 39   Affirmed.