2026 IL App (1st) 230117-U

No. 1-23-0117

Order filed January 27, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 18 CR 6747 01 |
| ANTHONY BELL, | ) ) | Honorable Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirmed. Defendant's convictions for second degree murder, aggravated discharge of a firearm, and aggravated battery with a firearm were supported by sufficient evidence. Defendant's sentence was not excessive.

¶ 2    A jury found defendant Anthony Bell guilty of the second-degree murder of Warren Strenger under a theory of imperfect self-defense (720 ILCS 5/9-2(a)(2) (West 2018)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)), and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2018)). The trial court imposed 18 years'

imprisonment for second-degree murder, consecutive to concurrent terms of 10 years' and 16 years' imprisonment for aggravated discharge of a firearm and aggravated battery, respectively. On appeal, defendant claims (1) the State failed to disprove that his belief in the need for self-defense was reasonable, and (2) his sentence was excessive. We disagree and affirm.

¶ 3    Defendant was charged by indictment with six counts of first-degree murder, six counts of attempted first-degree murder, one count of aggravated battery with a firearm, one count of aggravated discharge of a firearm, and six counts of aggravated unlawful use of a weapon. These charges arose from an incident on April 17, 2017, when defendant allegedly discharged a firearm at Strenger, Travis Willis, and Dexter Pope, killing Strenger and wounding Willis.

¶ 4    At trial, Pope testified that on April 17, 2018, he worked for a Walmart near the intersection of 83rd Street and Stewart Avenue in Chicago. At approximately 6:50 p.m., he and his coworkers, Strenger and Willis, walked to a store about half a mile away. While passing near a shopping area containing a Home Depot and AutoZone, Pope saw a van parked beside Home Depot. A man, whom Pope identified in court as defendant, approached Strenger and spoke with him. Pope did not see either Strenger or Willis with a weapon and did not hear them threaten defendant or act aggressively toward him.

¶ 5    Pope turned and saw a "quick glimpse" of a firearm in defendant's hand and ran south. Pope next heard six or seven gunshots. "Immediately after that," Strenger approached Pope, said he was "hit," and collapsed. Willis ran eastbound and approached Pope and Strenger after the shooting. Pope saw that Willis was "grazed" by a bullet.

¶ 6    On cross-examination, Pope stated that he ran "a couple seconds" before he heard the gunshots. On redirect examination, Pope stated that Strenger's coat was "puffy," and Pope did

not see Strenger "make any movements towards his coat" when Pope saw defendant with a firearm.

¶ 7    Jocelyn Johnson testified that on April 17, 2018, she dated Antonio Henderson and traveled with him, defendant, and Troyci Shelton, her cousin, to Autozone in a van owned by Johnson and Henderson. When they arrived, they parked and waited for service. Johnson did not recall the conversation between Henderson and defendant in the van but knew that it caused her to look up and see a group of men in the parking lot.[1]

¶ 8    The State then impeached Johnson with her testimony at a prior proceeding. Johnson recalled the State asking her about the content of the conversation but did not recall her answer that defendant said, "[t]hat ain't never them and there they go." She also did not recall testifying similarly during the grand jury proceedings.

¶ 9    Johnson testified that, after she saw the group of men, the next thing she remembered was waking up at the police station. Johnson then testified that defendant exited the van and spoke with the men. The State again impeached her with her testimony at a prior proceeding, where she stated that the conversation between the men was "very short" before the gunfire began. Johnson testified at trial that she heard "a few" gunshots and saw "smoke" coming from defendant's "direction" but did not see him shoot. The State impeached Johnson with her prior testimony where she stated that she concluded that defendant was the shooter and did not see anyone in the other group of men holding weapons. The State also introduced quotes from a recorded interview where Johnson agreed that defendant was the only person shooting.

---

[1]Antonio Henderson was also charged for offenses arising from this incident. See *People v. Henderson*, 2024 IL App (1st) 220041-U. Henderson is not a party to this appeal.

¶ 10    Johnson next testified that the van was involved in a "high speed chase" with police officers. The van hit "a lot of cars" and eventually crashed into a wall, at which point Henderson and defendant fled the van. Johnson and Shelton were arrested. At the police station, Johnson spoke with officers and identified photographs of defendant and Henderson.

¶ 11    On cross-examination, Johnson stated that she did not know that defendant had a firearm, and, had she known, she would not have remained in the van. Johnson did not see defendant remove a firearm from a pocket or coat and did not see a firearm when he returned to the van. Johnson also acknowledged a theft conviction in August 2018 in Vermilion County.

¶ 12    Shelton testified that on April 17, 2018, she traveled to AutoZone with Johnson, Henderson, and defendant. Defendant left the van and approached a group of men in the parking lot. Shelton heard gunshots but did not recall how many. When defendant returned to the van, he said that the police were coming, so Henderson drove away at "a very fast pace" while the police followed with lights and sirens activated. Eventually, the van hit the wall of the expressway and stopped. Defendant left the van and ran into traffic down the expressway. Shelton did not remember if she saw defendant discharge a firearm at the men in the parking lot and did not see a firearm until officers retrieved it at the scene of the crash.

¶ 13    At the police station, Shelton identified a photograph of defendant and gave a statement to detectives. Shelton did not recall telling the detectives that she saw defendant discharging a firearm and that nobody else was shooting. Shelton did not recall testifying before the grand jury that, prior to defendant discharging his firearm, the three men did not "do anything," that she did not see them with "any kind of weapon," and that defendant continued to fire after the men ran.

¶ 14    On cross-examination, Shelton stated that she did not recall whether she said to anyone that the men began running before defendant fired.

¶ 15    Judge Matthew Jannusch of the circuit court testified that he was an assistant state's attorney (ASA) during a prior proceeding where Johnson and Shelton testified. Jannusch identified transcripts from the prior proceeding and testified that, during those proceedings, Johnson stated that the group of men ran from defendant when the shooting occurred. During those proceedings, Shelton testified that she saw defendant converse with the men briefly and then fire at them.

¶ 16    Administrative law judge Jamie Santini testified that he was an ASA during the grand jury proceedings on May 10, 2018, and questioned Johnson and Shelton. During the grand jury proceedings, Johnson testified that defendant conversed with the men, who were not holding weapons, before she saw him hold his hand "up" with "sparks from gunshots." Shelton testified that she saw defendant leave the van and approach the men, have a quick conversation with them, and then "start*** letting shots out."

¶ 17    Chicago police detective Thomas Dineen testified that he separately interviewed Johnson and Shelton at the police station, and the interviews were recorded. Portions were published and are included in the record on appeal.

¶ 18    Chicago police officer Jamel Pankey testified that on April 17, 2018, he and his partner were in a marked vehicle with video equipment. They were driving eastbound on 87th Street when Pankey heard gunshots and saw defendant fire at a group of people five or six times before the group "scatter[ed]." Once defendant entered the van, Pankey activated his vehicle's emergency equipment, including lights and sirens. Pankey followed the van onto the expressway,

which was congested with heavy traffic. The van drove erratically through traffic before crashing into the concrete median. Defendant left the van and ran southbound on the expressway. Pankey pursued in his vehicle and next saw defendant in custody. Pankey identified the squad vehicle footage, which was published.

¶ 19    Chicago police officer Juan Diaz testified that he arrested Henderson, who had fled and hid under a bridge. Diaz identified footage from his body worn camera, which was published.

¶ 20    Chicago police officer Xavier Humphrey testified that he and his partner, Officer Nathan Smith, responded to the crashed van on the expressway and recovered a loaded firearm from underneath the "driver's side seat." Humphrey identified the firearm, a black Glock semi-automatic handgun, in court.

¶ 21    Chicago police officer Charles Spears testified that he chased defendant, whom he identified in court, on foot through heavy traffic on the expressway and arrested him. The State published footage from a pod camera in the area, which Spears identified and narrated.

¶ 22    Forensic investigator Paul Presnell testified that he videotaped and photographed the parking lot, and recovered discharged firearm cartridge cases and Strenger's clothing, which included a black puffy coat with a thinner green jacket inside. The jacket was heavy and contained a revolver in the right pocket, which was zipped closed. Presnell observed damage to an SUV's back window consistent with a bullet hole. Presnell identified photographs showing the bullet hole in the SUV, Strenger's clothing, and bullet holes in Strenger's clothing.

¶ 23    On cross-examination, Presnell stated that he wrote in an inventory receipt that the firearm was in the front left pocket of the jacket but conceded that he also documented it as in the right pocket five other times. Presnell stated that he did not notice the mistake until the day of

trial. Presnell agreed that because the jacket was thin, "a metal object outline could be discerned through that jacket depending upon the positioning of the items."

¶ 24    Forensic scientist Marc Pomerance testified that he examined the recovered Glock, magazine, and bullets as well as three recovered cartridge cases, and determined that all three cartridge cases had been discharged from the Glock and could not have been fired from Strenger's revolver.

¶ 25    Dr. Ponni Arunkumar, chief medical examiner for Cook County, testified regarding the post-mortem examination report that Dr. Eric Eason prepared after he performed the autopsy on Strenger. The report stated that Eason observed two gunshot entrance wounds on Strenger's back. Dr. Arunkumar identified autopsy photographs depicting probes showing the path of the bullets. Strenger died as a result of multiple gunshot wounds; the manner of death was homicide.

¶ 26     On cross-examination, Dr. Arunkumar agreed with defense counsel's assessment that the path of the bullets showed that either the firearm was at an angle or Strenger's body was "twisted" at the time of impact. On redirect examination, Dr. Arunkumar testified that the trajectory of the bullets was "back-to front *** and downward *** right-to-left."

¶ 27    The State introduced several stipulations.

¶ 28    First, Dr. John Baldwin would testify that on April 17, 2018, he treated Willis for a gunshot wound to his right forearm. The parties additionally stipulated that Willis was killed on May 1, 2021, during an incident unrelated to the case.

¶ 29    Next, a Chicago police officer would testify that he swabbed a Glock semiautomatic firearm for DNA and performed a fingerprint analysis on the firearm, a Glock magazine, and ten 9-millimeter rounds. The firearm yielded no latent impressions suitable for comparison. Forensic

scientist Kelly McNallan would testify that she conducted a DNA analysis on the swab from the firearm and identified a mixture of DNA profiles on the firearm from at least four people that was not suitable for comparison to known DNA standards from defendant and Henderson.

¶ 30    Defendant testified that on April 17, 2018, he traveled with Henderson, Johnson, and Shelton to AutoZone. When they were waiting at AutoZone, a group of men caught defendant's attention because he thought he knew one of the men, Strenger, from school. Henderson moved the van closer to the group, and defendant left to approach them. Defendant asked Strenger, "[h]ey, shorty, don't I know you from somewhere?" Strenger responded, "[n]o, p***, you don't know me." He also told defendant "to get the f*** away from him before he f*** [defendant] up," which defendant understood as Strenger threatening to hurt him.

¶ 31    Defendant testified that Strenger then turned, twisting his body, moved his coat out of the way, and reached for the right pocket of his jacket. Defendant demonstrated the motion in court. When Strenger turned, defendant saw a firearm "poking out" from Strenger's jacket pocket, and so defendant believed that Strenger was reaching for his firearm. Defendant was afraid that Strenger would shoot him, so he shot Strenger and ran to the van, where he told Henderson that the police were coming. After the van crashed on the expressway, defendant ran because he was afraid and confused but then surrendered to the officers.

¶ 32    On cross-examination, defendant stated that Strenger moved toward "[h]is right side," where he observed the outline of a "gun pressed against his jacket pocket," but defendant agreed that Strenger was also wearing a black puffy coat. Defendant saw Strenger reach for the pocket where defendant saw the outline of a firearm, but Strenger never "[got] the chance to point a gun" at defendant. Strenger and the other men ran after defendant began shooting.

¶ 33    The defense introduced a stipulation that an evidence technician with the Chicago Police Department would testify that he swabbed the recovered revolver for DNA, performed a fingerprint analysis on it, and found no latent "compression" suitable for comparison.

¶ 34    The jury found defendant guilty of the second-degree murder of Strenger, aggravated discharge of a firearm, and aggravated battery of Willis.

¶ 35    Defendant filed a motion for a new trial, arguing, among other things, that the State failed to disprove his affirmative defense of self-defense, because his belief that he needed to defend himself against Strenger was reasonable. The court denied defendant's motion.

¶ 36    Defendant's presentence investigation report (PSI) showed one pending 2017 case for aggravated unlawful use of a weapon, for which defendant was scheduled to appear before the court in September 2022. The PSI was corrected to add a juvenile charge for delinquency on July 24, 2013, for which defendant was sentenced to two years' probation, terminated satisfactorily. He was affiliated with the Gangster Disciples street gang from age 15 to 21; he was 21 years old at the time of the offense.

¶ 37    Defendant had a good relationship with his father and siblings. He experienced a "fair" childhood due to violence in his neighborhood but was raised in a stable home with his needs met. Defendant worked for his father as a property manager until defendant's incarceration and hoped to obtain a GED and attend college for business. He drank alcohol monthly, used marijuana daily, and consumed two pills of ecstasy about five times a month.

¶ 38    In aggravation, the State published the statements of Strenger's mother, Nakita Strenger, and cousin, Ariel Strenger, wherein they described the emotional and physical toll that Strenger's death had on their family.

¶ 39    In mitigation, defense counsel presented a statement by defendant's father and read a portion into the record. That portion noted that, among other things, defendant was "raised with loving care, manners, respect, and honor" and had two children, one of which died during his incarceration. Defense counsel submitted letters from defendant's family and friends describing his good character.

¶ 40    The State requested the maximum term, arguing that defendant's actions caused or threatened serious harm to not only the victims but other people in the vicinity, defendant had a history of delinquency or other criminal activity, he had committed the instant offenses while on bond "for another gun" felony, and the sentence was necessary to deter others from committing the same crime.

¶ 41    Defense counsel argued in mitigation that defendant feared for his life during the incident, substantial grounds existed to justify his actions, his prior offenses were for nonviolent crimes, the criminal conduct resulted from circumstances unlikely to recur, and he was unlikely to commit another crime.

¶ 42    In allocution, defendant thanked the court for treating him and his family fairly during the trial.

¶ 43    The court imposed 18 years' imprisonment for second-degree murder, consecutive to concurrent prison terms of 10 years and 16 years for the aggravated discharge of a firearm and aggravated battery counts, respectively. The court stated that it considered the evidence at trial, the PSI, the character and attitude of defendant, and the evidence and arguments in aggravation and mitigation. The court specified that it considered the harm defendant caused, including that he shot Strenger in his back, the time and location of the shooting, that defendant was affiliated

with the Gangster Disciples street gang, defendant's criminal history, and the letters in aggravation. The court also considered that defendant was convicted of a lesser-mitigated offense, the letters from defendant's family, his lack of prior felony convictions, and his work and family history.

¶ 44    The court denied defendant's motion to reconsider his sentence, which claimed, among other arguments, that his sentence was excessive.

¶ 45    On appeal, defendant first argues that the State did not disprove his belief that he was acting in self-defense by shooting Strenger. Defendant claims he reasonably believed that Strenger was reaching for a firearm, and thus defendant was justified in using deadly force to stop Strenger. Because his belief in the need for self-defense was reasonable, his convictions should be reversed outright.

¶ 46    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). This standard applies whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007) (citing *People v. Cooper*, 194 Ill. 2d 419, 431 (2000)).

¶ 47    The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court must draw all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the

evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 48    To convict for first-degree murder, the State had to prove that defendant, without lawful justification, knowingly or intentionally shot and killed Strenger. 720 ILCS 5/9-1(a) (West 2018). If a defendant, as here, affirmatively raises self-defense, the State bears the burden of additionally proving beyond a reasonable doubt that the use of force was not justified. *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 26. If the State negates the defendant's self-defense claim, the factfinder must find the defendant guilty of first- or second-degree murder. *Id*.

¶ 49    Second-degree murder is a lesser-mitigated offense of first-degree murder, with the same elements and required mental state. *People v. Staake*, 2017 IL 121755, ¶ 40. First-degree murder may be mitigated to second-degree murder if there is sufficient evidence that a defendant believed he was acting in self-defense, but that belief was objectively unreasonable. See *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995); 720 ILCS 5/9-2(a)(2) (West 2018). "The determination of whether a defendant is guilty of first-degree murder or guilty of second-degree murder or was justified because acting in self-defense is a question for the finder of fact." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 50    Defendant acknowledges shooting Strenger but claims his belief in the need for self-defense was reasonable. "[T]he use of deadly force is only justified if the defendant reasonably believes that such force is necessary to prevent imminent death or great bodily harm." (Internal quotation marks omitted.) *People v. Jones*, 2024 IL App (1st) 221555, ¶ 32. Defendant claims he was justified in using force against Strenger because Strenger threatened him and then moved to reach into his right pocket, where defendant saw the outline of a firearm. Even if his judgment

was imperfect, he says, the circumstances were such that his actions were justified. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 55 ("A defendant need not exercise infallible judgment, only reasonable judgment under the existing circumstances." (Internal quotation marks omitted).

¶ 51    In our view, a rational juror could have found the evidence, viewed in the light most favorable to the State, sufficient to prove beyond a reasonable doubt that defendant's belief that deadly force was necessary was objectively unreasonable.

¶ 52    The State presented evidence that defendant approached Strenger in a parking lot and, after a brief interaction, shot him in the back twice. Strenger was neither wielding a weapon nor advancing toward defendant. While defendant testified that he observed Strenger reach for a firearm in his pocket, the State presented evidence that the pocket was zipped closed.

¶ 53    Additionally, Pope testified that he did not hear Strenger threaten defendant. Lastly, after shooting Strenger, defendant fled the scene and led police on a high-speed vehicle chase, then ran away on foot down the expressway during heavy traffic, actions that at least arguably express a guilty state of mind and knowledge that he did not act in self-defense. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59 ("[e]vidence of flight *** is competent circumstantial evidence that refutes the theory that [the] defendant acted in self-defense").

¶ 54    The jury could have believed this evidence; it was not obligated to accept defendant's account of events over the evidence that supported the State's theory. See *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002). "The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases." *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67; see *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009) ("[T]he trier of fact is not required to

accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." (Internal quotation marks omitted).

¶ 55     Taking the evidence in the light most favorable to the State, a jury could have reasonably concluded that defendant's belief in the need to employ deadly force against Strenger was objectively unreasonable. As the evidence is not so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt," we affirm his convictions. See *Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 56     Next, defendant argues that his sentence was excessive because he had no prior felony convictions, and the jury believed that he shot Strenger in mistaken self-defense. Defendant claims the court failed to consider "the unique circumstances" of the case, his lack of criminal history, his employment history, and his strong family ties.

¶ 57     A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I § 11; *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 48. A sentencing court's decision is reviewed for abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A court abuses its discretion where the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id*. (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 58     The court is afforded great deference because the judge "observed the defendant and the proceedings" and is better positioned to weigh the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id*. at 212-13. Thus, the

reviewing court " 'must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently.' " *Id.* at 213 (quoting *Stacey*, 193 Ill. 2d at 209).

¶ 59    While the court must consider all factors in aggravation and mitigation, the seriousness of the offense, rather than the mitigating evidence, is deemed the most important factor. *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 94. The trial court is presumed to consider "all relevant factors and any mitigation evidence presented" (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48) but is not obligated to recite and assign a value to each factor. *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011). Rather, the defendant must affirmatively show that the court did not consider the relevant sentencing factors. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67.

¶ 60    A sentence within the statutory range is presumed proper. *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 73. Here, defendant was convicted of second-degree murder, with a sentencing range of 4 to 20 years' imprisonment. 730 ILCS 5/5-4.5-30(a) (West 2018). Defendant was also convicted of aggravated discharge of a firearm and aggravated battery with a firearm, which have sentencing ranges of 4 to 15 years' and 6 to 30 years' imprisonment, respectively. *Id.* §§ 5-4.5-30(a), 5-4.5-25. Defendant's sentence for second-degree murder was mandatorily consecutive to his sentences for aggravated discharge of a firearm and aggravated battery. 730 ILCS 5/5-8-4(d)(1) (West 2018). Defendant's sentences are within these statutory guidelines and are thus presumed proper. *Villalobos*, 2020 IL App (1st) 171512, ¶ 73.

¶ 61    Defendant's claim that the trial court failed to properly consider the enumerated mitigating factors lacks support in the record. The trial court stated that it reviewed the relevant factors in mitigation and aggravation, and defendant points to no evidence, beyond the length of his sentence, to support his claim otherwise. See *Kindle*, 2021 IL App (1st) 190484, ¶ 67. The

trial court was not obligated to reduce the sentence it imposed any further merely due to the presence of mitigating factors. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 62 Here, defendant shot Strenger twice in the back in a parking lot where a bullet hole was discovered in an SUV parked nearby. The van defendant entered then drove through traffic onto the expressway, leading police officers on a high-speed chase before crashing into the median. Defendant then led officers on a foot chase through heavy traffic on the expressway. The court could have concluded that defendant disregarded the safety of the people around him, regardless of his reasons for shooting Strenger, and sentenced him accordingly. As the record establishes that the court properly considered the factors in aggravation and mitigation, defendant has not established an abuse of discretion.

¶ 63 Finally, defendant claims the court failed to consider his youth and its attendant circumstances, as he was 21 years old at the time of the offense. Defendant cites *Miller v. Alabama*, 567 U.S. 460 (2012), for this proposition and argues that his actions in shooting Strenger evince recklessness and impulsivity, typical characteristics of youth.

¶ 64 Defendant is not explicitly raising a *Miller* claim, nor could he, as such challenges are not available to defendants over 18 at the time of the offense or those with sentences of 40 years or less. See *People v. Harris*, 2018 IL 121932, ¶ 61; *People v. Buffer*, 2019 IL 122327, ¶ 41. He is free to raise a proportionate-penalties claim inspired by *Miller*, of course. *People v. Hewitt*, 2025 IL App (1st) 231294, ¶ 50; see *People v. Clark*, 2023 IL 127273, ¶ 87. And while defense counsel briefly referenced the proportionate-penalties clause in the motion to reconsider sentencing below, defendant offered nothing in particular, by way of science or otherwise, to indicate that this 21-

year-old defendant had, as he puts it on appeal, "an underdeveloped sense of responsibility leading to recklessness and impulsiveness."

¶ 65     Defendant has failed to meet his burden to affirmatively show that the court did not adequately consider all relevant factors during sentencing. See *Kindle*, 2021 IL App (1st) 190484, ¶ 67. The court did not abuse its discretion in sentencing defendant. We affirm his sentence of 34 years' imprisonment.

¶ 66     The judgment of the circuit court is affirmed.

¶ 67     Affirmed.